689 So.2d 239 (1996)
Richard HENYARD, Appellant,
v.
STATE of Florida, Appellee.
No. 84314.
Supreme Court of Florida.
December 19, 1996.
Rehearing Denied March 11, 1997.
*242 James B. Gibson, Public Defender and Michael S. Becker, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, for Appellant.
Robert A. Butterworth, Attorney General; and Mark S. Dunn and Kenneth S. Nunnelley, Assistant Attorneys General, Daytona Beach, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Richard Henyard. We have jurisdiction, art. V, § 3(b)(1), Fla. Const., and affirm the convictions and sentence.

FACTS
The record reflects that one evening in January, 1993, eighteen-year-old Richard Henyard stayed at the home of a family friend, Luther Reed. While Reed was making dinner, Henyard went into his bedroom and took a gun that belonged to Reed. Later that month, on Friday, January 29, Dikeysha Johnson, a long-time acquaintance of Henyard, saw him in Eustis, Florida. While they were talking, Henyard lifted his shirt and displayed the butt of a gun in the front of his pants. Shenise Hayes also saw Henyard that same evening. Henyard told her he was going to a night club in Orlando and to see his father in South Florida. He showed Shenise a small black gun and said that, in order to make his trip, he would steal a car, kill the owner, and put the victim in the trunk.
William Pew also saw Henyard with a gun during the last week in January and Henyard tried to persuade Pew to participate in a robbery with him. Later that day, Pew saw Henyard with Alfonza Smalls, a fourteen-year-old friend of Henyard's. Henyard again displayed the gun, telling Pew that he needed a car and that he intended to commit a robbery at either the hospital or the Winn Dixie.
Around 10 p.m. on January 30, Lynette Tschida went to the Winn Dixie store in Eustis. She saw Henyard and a younger man sitting on a bench near the entrance of the store. When she left, Henyard and his companion got up from the bench; one of them walked ahead of her and the other behind her. As she approached her car, the one ahead of her went to the end of the bumper, turned around, and stood. Ms. Tschida quickly got into the car and locked the doors. As she drove away, she saw Henyard and the younger man walking back towards the store.
At the same time, the eventual survivor and victims in this case, Ms. Lewis and her daughters, Jasmine, age 3, and Jamilya, age 7, drove to the Winn Dixie store. Ms. Lewis noticed a few people sitting on a bench near the doors as she and her daughters entered the store. When Ms. Lewis left the store, she went to her car and put her daughters in the front passenger seat. As she walked behind the car to the driver's side, Ms. Lewis noticed Alfonza Smalls coming towards her. As Smalls approached, he pulled up his shirt and revealed a gun in his waistband. Smalls ordered Ms. Lewis and her daughters into the back seat of the car, and then called to Henyard. Henyard drove the Lewis car out of town as Smalls gave him directions.
The Lewis girls were crying and upset, and Smalls repeatedly demanded that Ms. Lewis "shut the girls up." As they continued to drive out of town, Ms. Lewis beseeched Jesus for help, to which Henyard replied, "this ain't Jesus, this is Satan." Later, Henyard *243 stopped the car at a deserted location and ordered Ms. Lewis out of the car. Henyard raped Ms. Lewis on the trunk of the car while her daughters remained in the back seat. Ms. Lewis attempted to reach for the gun that was lying nearby on the trunk. Smalls grabbed the gun from her and shouted, "you're not going to get the gun, bitch." Smalls also raped Ms. Lewis on the trunk of the car. Henyard then ordered her to sit on the ground near the edge of the road. When she hesitated, Henyard pushed her to the ground and shot her in the leg. Henyard shot her at close range three more times, wounding her in the neck, mouth, and the middle of the forehead between her eyes. Henyard and Smalls rolled Ms. Lewis's unconscious body off to the side of the road, and got back into the car. The last thing Ms. Lewis remembers before losing consciousness is a gun aimed at her face. Miraculously, Ms. Lewis survived and, upon regaining consciousness a few hours later, made her way to a nearby house for help. The occupants called the police and Ms. Lewis, who was covered in blood, collapsed on the front porch and waited for the officers to arrive.
As Henyard and Smalls drove the Lewis girls away from the scene where their mother had been shot and abandoned, Jasmine and Jamilya continued to cry and plead: "I want my Mommy," "Mommy," "Mommy." Shortly thereafter, Henyard stopped the car on the side of the road, got out, and lifted Jasmine out of the back seat while Jamilya got out on her own. The Lewis girls were then taken into a grassy area along the roadside where they were each killed by a single bullet fired into the head. Henyard and Smalls threw the bodies of Jasmine and Jamilya Lewis over a nearby fence into some underbrush.
Later that evening, Bryant Smith, a friend of Smalls, was at his home when Smalls, Henyard, and another individual appeared in a blue car. Henyard bragged about the rape, showed the gun to Smith, and said he had to "burn the bitch" because she tried to go for his gun. Shortly before midnight, Henyard also stopped at the Smalls' house. While he was there, Colinda Smalls, Alfonza's sister, noticed blood on his hands. When she asked Henyard about the blood, he explained that he had cut himself with a knife. The following morning, Sunday, January 31, Henyard had his "auntie," Linda Miller,[1] drive him to the Smalls' home because he wanted to talk with Alfonza Smalls. Colinda Smalls saw Henyard shaking his finger at Smalls while they spoke, but she did not overhear their conversation.
That same Sunday, Henyard went to the Eustis Police Department and asked to talk to the police about the Lewis case. He indicated that he was present at the scene and knew what happened. Initially, Henyard told a story implicating Alfonza Smalls and another individual, Emmanuel Yon. However, after one of the officers noticed blood stains on his socks, Henyard eventually admitted that he helped abduct Ms. Lewis and her children, raped and shot her, and was present when the children were killed. Henyard continuously denied, however, that he shot the Lewis girls. After being implicated by Henyard, Smalls was also taken into custody. The gun used to shoot Ms. Lewis, Jasmine and Jamilya was discovered during a subsequent search of Smalls' bedroom.
The autopsies of Jasmine and Jamilya Lewis showed that they both died of gunshot wounds to the head and were shot at very close range. Powder stippling around Jasmine's left eye, the sight of her mortal wound, indicated that her eye was open when she was shot. One of the blood spots discovered on Henyard's socks matched the blood of Jasmine Lewis. "High speed" or "high velocity" blood splatters found on Henyard's jacket matched the blood of Jamilya Lewis and showed that Henyard was less than four feet from her when she was killed. Smalls' trousers had "splashed" or "dropped blood" on them consistent with dragging a body. DNA evidence was also presented at trial indicating that Henyard raped Ms. Lewis.
Henyard was found guilty by the jury of three counts of armed kidnapping in violation of section 787.01, Florida Statutes (1995), one count of sexual battery with the use of a *244 firearm in violation of section 794.011(3), Florida Statutes (1995), one count of attempted first-degree murder in violation of sections 782.04(1)(a)(1) and 777.04(1), Florida Statutes (1995), one count of robbery with a firearm in violation of section 812.13(2)(a), Florida Statutes (1995), and two counts of first-degree murder in violation of section 782.04(1)(a), Florida Statutes (1995).
After a penalty phase hearing, the jury recommended the death sentence for each murder by a vote of 12 to 0. The trial court followed this recommendation and sentenced Henyard to death. The court found in aggravation: (1) the defendant had been convicted of a prior violent felony, see section 921.141(5)(b); (2) the murder was committed in the course of a felony, see section 921.141(5)(d); (3) the murder was committed for pecuniary gain, see section 921.141(5)(f) and, (4) the murder was especially heinous, atrocious or cruel, see section 921.141(5)(h).
The court found Henyard's age of eighteen at the time of the crime as a statutory mitigating circumstance, see section 921.141(6)(g), and accorded it "some weight." The trial court also found that the defendant was acting under an extreme emotional disturbance and his capacity to conform his conduct to the requirements of law was impaired,[2]see section 921.141(6)(b),(f), and accorded these mental mitigators "very little weight." As for nonstatutory mitigating circumstances, the trial court found the following circumstances but accorded them "little weight": (1) the defendant functions at the emotional level of a thirteen year old and is of low intelligence; (2) the defendant had an impoverished upbringing; (3) the defendant was born into a dysfunctional family; (4) the defendant can adjust to prison life; and (5) the defendant could have received eight consecutive life sentences with a minimum mandatory fifty years. Finally, the trial court accorded "some weight" to the nonstatutory mitigating circumstance that Henyard's codefendant, Alfonza Smalls, could not receive the death penalty as a matter of law.[3] The court concluded that the mitigating circumstances did not offset the aggravating circumstances.

APPEAL
Henyard raises eleven claims on appeal.[4] Claims (2)(b) and (8)(a) were not properly *245 preserved for appellate review and are therefore procedurally barred. Assuming arguendo that claims (2)(b) and (8)(a) were preserved for appeal, we find claim (2)(b) to be without merit and claim (8)(a) to be harmless error. State v. DiGuilio, 491 So.2d 1129 (Fla.1986); see also Floyd v. State, 497 So.2d 1211, 1214-15 (Fla.1986); Menendez v. State, 368 So.2d 1278, 1282 (Fla.1979). Claims (7)[5] and (9)[6] have been previously rejected by this Court in other cases and do not require additional discussion here.

Change of Venue
In McCaskill v. State, 344 So.2d 1276, 1278 (Fla.1977), we adopted the test set forth in Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), and Kelley v. State, 212 So.2d 27 (Fla. 2d DCA 1968), for determining whether to grant a change of venue:
Knowledge of the incident because of its notoriety is not, in and of itself, grounds for a change of venue. The test for determining a change of venue is whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds and try the case solely upon the evidence presented in the courtroom.
Id. at 1278 (quoting Kelley, 212 So.2d at 28). See also Pietri v. State, 644 So.2d 1347 (Fla. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 2588, 132 L.Ed.2d 836 (1995). In Manning v. State, 378 So.2d 274 (Fla.1980), we further explained:
An application for change of venue is addressed to the sound discretion of the trial court, but the defendant has the burden of ... showing that the setting of the trial is inherently prejudicial because of the general atmosphere and state of mind of the inhabitants in the community. A trial judge is bound to grant a motion for a change of venue when the evidence presented reflects that the community is so pervasively exposed to the circumstances of the incident that prejudice, bias, and preconceived opinions are the natural result. The trial court may make that determination upon the basis of evidence presented prior to the commencement of the jury selection process, or may withhold making the determination until an attempt is made to obtain impartial jurors to try the cause.
Id. at 276 (citation omitted). Ordinarily, absent an extreme or unusual situation, the need to change venue should not be determined until an attempt is made to select a jury.
During the actual voir dire here, each prospective juror was questioned thoroughly and individually about his or her exposure to *246 the pretrial publicity surrounding the case. While the jurors had all read or heard something about the case, each stated that he or she had not formed an opinion and would consider only the evidence presented during the trial in making a decision. Further, the record demonstrates that the members of Henyard's venire did not possess such prejudice or extensive knowledge of the case as to require a change of venue. Therefore, we find that on the record before us, the trial court did not abuse its discretion in denying Henyard's motions for a change of venue.

Voir Dire
Next, Henyard asserts that the trial court erred during jury selection by granting the state's challenge for cause of a prospective juror who stated that Henyard's young age of eighteen at the time of the crime would prevent him from recommending the death penalty. Henyard asserts that the prospective juror "merely stated that he would follow the law and in his opinion would give great weight to the statutory mitigating factor of age." However, the record reflects that when Henyard's defense counsel attempted to rehabilitate the prospective juror, the following colloquy occurred:
DEFENSE COUNSEL: Okay. Now, do you think thatWell, let's get down to the bottom line here. I guess from what you're telling me that even though you have some reservations about the death penalty, you could follow the law if the Judge told you this is the law this is what you have to apply; is that fair to say?
[JUROR]: No.
DEFENSE COUNSEL: You couldn't do it at all?
[JUROR]: I couldn't do it.
DEFENSE COUNSEL: Okay, no further questions, your Honor.
Contrary to Henyard's assertion on appeal, the prospective juror never stated that he could follow the law. Rather, he expressly stated that he could not follow the law, and could not recommend a death sentence for Henyard because of his young age. Consequently, we find that the trial court did not abuse its discretion in excluding this juror for cause.

Admissibility of Henyard's Confession
Next, Henyard argues that his right against self-incrimination under article I, section 9 of the Florida Constitution was violated during his interrogation at the Eustis Police Department when he indicated to the officers his desire to terminate questioning. Because the officers failed to terminate the interrogation or clarify his requests to cease questioning, Henyard maintains that the trial court erred in admitting his first confession against him at trial.[7]
In Owen v. State, 560 So.2d 207 (Fla.), cert. denied, 498 U.S. 855, 111 S.Ct. 152, 112 L.Ed.2d 118 (1990), we reversed a defendant's convictions, concluding that his statements were erroneously admitted into evidence contrary to Miranda and that his confession was the "essence" of the state's case against him. Id. at 211. During his interrogation, Owen never requested counsel, but expressly stated: "I'd rather not talk about it." Id. Subsequently, we held in Traylor v. State, 596 So.2d 957 (Fla.1992), that a suspect's request to cease interrogation is also protected under the Florida Constitution. Thus, our decisions in Owen and Traylor give effect to an individual's right to remain silent.
In this case, Henyard voluntarily went to the Eustis Police Department to provide information about the murders of the Lewis children. He saw Sergeant Wayne Perry in the parking lot when he arrived, and immediately *247 told him he had been present when the children were killed but that he did not do it. Henyard voluntarily accompanied Sergeant Perry inside the stationhouse where the officers investigating the Lewis murders were advised that Henyard had come to the police station with information about the crime. Henyard talked with the investigating officers in an interview room at the Eustis Police Department.
Initially, Henyard contends that the officers should have ceased their interrogation of him when he asked how long the questioning would last. He cites the following exchange:
HENYARD: Can I go home soon, man?
OFFICER: Soon. You know how these federal people are though. They're not like us local boys.
. . . .
HENYARD: Excuse me, sir. How long [am] I gonna have to stay here?
FBI AGENT: Huh?
HENYARD: How long do I have to stay here?
FBI AGENT: Ah, just a few more minutes.
We find that Henyard's queries do not constitute even an equivocal indication that he wished to cease questioning. See Moore v. Dugger, 856 F.2d 129 (11th Cir.1988)(holding defendant's request during interrogation for information about when, in the future, he would be allowed to leave was not attempt to exercise right under Miranda to terminate questioning and remain silent); see also Delap v. Dugger, 890 F.2d 285, 291-93 (11th Cir.1989)(holding defendant's questions to interrogating officers concerning how long it would be before he could go home did not constitute equivocal invocation of Fifth Amendment right to terminate questioning), cert. denied, 496 U.S. 929, 110 S.Ct. 2628, 110 L.Ed.2d 648 (1990). Rather, Henyard asked for a time frame, inquiring as to how long the questioning would take. Moreover, immediately after this exchange, Henyard was provided with a written "Miranda" form explaining his Fifth Amendment rights and was also orally advised of his rights. When asked if he understood his rights, Henyard not only indicated that he did, but he expressly waived them and continued answering questions about his activities on the preceding evening.
Henyard also asserts that he made a second request to terminate the questioning. After the initial interrogation, an FBI agent asked Henyard if he would be willing to take a polygraph test. Henyard responded that he would not do so without the presence of his aunt. When told that his aunt could be contacted but she could not sit next to him during the test, he refused to submit to the test. A discussion ensued concerning the whereabouts of Henyard's "auntie" so that she could be contacted and brought to the station for his support:
FBI AGENT: After you talk to her Don't you want to resolve this right now?
HENYARD: Yes, I do.
FBI AGENT: Okay, you just hang out here. What else you going to do? You going to hang out at the Manors, you can hang out here, okay?
HENYARD: Huh?
FBI AGENT: You just stay here a minuteyou know, we can't force you to stay here (Inaudible.)
HENYARD: Take me to my auntie's house.
FBI AGENT: We're going to have your aunt come down here.
HENYARD: Ya'll (Inaudible.)
FBI AGENT: Yeah, we're going to have
HENYARD: Superbowl, man. I'm missing my game.
FBI AGENT: Well, it's 6:00. You've got a couple of [sic] three hours yet. I mean you're equivocating [sic] a Superbowl to two kids, two innocent children being killed?
In this instance, Henyard's request to be taken "to his auntie's house" was made incidental to securing her presence during the polygraph test, and as an aside from the interrogation. Henyard's discussion with the officers at this point did not concern his activities on the preceding evening or his involvement in the offense, but rather focused on whether he would be willing to take *248 a polygraph test if his aunt could be with him at the police station. In this context, and in light of Henyard's voluntary presence at the police station for the purpose of disclosing information he had concerning the offense, we find no error in the trial court's conclusion that this discussion did not constitute a request to end the interrogation. Cf. Delap; Moore.
Even assuming arguendo that Henyard's request to be taken to his aunt's house was an equivocal invocation of his right to terminate questioning, we find that any error in admitting these statements did not contribute to the outcome in this case and would be harmless beyond a reasonable doubt. State v. DiGuilio, 491 So.2d 1129 (Fla.1986). Unlike our decision in Owen where we explained that "[e]ven though there was corroborating evidence, Owen's statements were the essence of the case against him," 560 So.2d at 211, Henyard's statements to police certainly were not the "essence" of the state's case here. Rather, the other evidence presented at trial of Henyard's guilt was extensive and overwhelming, to include: (1) the "motive" and "intent" testimony of several of Henyard's acquaintances who, during the week preceding the offense, saw him with the gun later shown to have killed the Lewis girls to the exclusion of all others, and heard him brag that he was going to steal a car, kill the owner, and put the victim in the trunk; (2) the testimony of the surviving victim, Ms. Lewis, who identified Henyard and Smalls, and detailed the sequence of events leading up to her daughters' deaths; (3) DNA evidence establishing that Henyard raped Ms. Lewis and had blood on his clothes that matched the blood of Jasmine and Jamilya Lewis; (4) the gun found in a search of Smalls' bedroom was the same one used to shoot Ms. Lewis and kill the Lewis children; and (5) the testimony of several witnesses who saw and heard Henyard implicate himself in the crime after its commission.
Moreover, Henyard consistently denied any role in killing the Lewis girls, and, at trial, Henyard's trial strategy was, in essence, to concede his participation in the crimes except as to the killing of the children. Hence, his statements were consistent with this strategy.

The Admissibility of DNA Evidence
Henyard argues that the trial court abused its discretion in admitting DNA evidence at trial because the state failed to establish a proper predicate of reliability for the DNA testing procedures employed by the Florida Department of Law Enforcement (FDLE) in this case. At trial, an FDLE serologist testified about the DNA analysis she conducted on blood stains found on the clothing of Henyard and Smalls. She testified that blood stains on Henyard's clothing matched the blood of Jamilya and Jasmine Lewis, and that blood stains on Alfonza Small's clothing matched the DNA of Ms. Lewis and Jamilya Lewis.
Henyard contends that FDLE testing procedures were unreliable because (1) the laboratory was not in compliance with the recommendations of the National Research Council in its report on DNA testing and methodology, and (2) the only person who testified as to the reliability of the testing procedures utilized by FDLE was the FDLE employee who conducted the tests.
In Robinson v. State, 610 So.2d 1288 (Fla. 1992), cert. denied, 510 U.S. 1170, 114 S.Ct. 1205, 127 L.Ed.2d 553 (1994), we explained:
In admitting the results of scientific tests and experiments, the reliability of the testing methods is at issue, and the proper predicate to establish that reliability must be laid. Ramirez v. State, 542 So.2d 352 (Fla.1989). If the reliability of a test's results is recognized and accepted among scientists, admitting those results is within the trial court's discretion. Stevens v. State, 419 So.2d 1058 (Fla.1982), cert. denied, 459 U.S. 1228, 103 S.Ct. 1236, 75 L.Ed.2d 469 (1983). When such reliable evidence is offered, "any inquiry into its reliability for purposes of admissibility is only necessary when the opposing party makes a timely request for such an inquiry supported by authorities indicating that there may not be general scientific acceptance of the technique employed." Correll v. State, 523 So.2d 562, 567 (Fla.), cert. *249 denied, 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 152 (1988) (emphasis supplied).
Id. at 1291. Subsequently, in Hayes v. State, 660 So.2d 257, 264 (Fla.1995), we took judicial notice "that DNA test results are generally accepted as reliable in the scientific community, provided that the laboratory has followed accepted testing procedures that meet the Frye[8] test to protect against false readings and contamination." In so doing, we placed great emphasis on the recommendations concerning the standards and methodology for DNA testing set forth by the National Research Council (NRC) in its latest report, DNA Technology in Forensic Science (1992). Id. at 263.
Henyard argues that in Hayes we "approved of the NRC Report and apparently endorsed it as a means of determining the admissibility of DNA evidence at trial." Conversely, the State contends that in order for DNA evidence to be admissible under Hayes, DNA testing procedures utilized by a laboratory need not precisely conform to NRC recommendations so long as the laboratory's testing procedures meet the Frye test for reliability. We agree with the State.
In this case, the trial court conducted a Frye hearing as to the admissibility of the DNA tests and results prior to trial. Evidence offered at the hearing established that: (1) FDLE's DNA analysis in this case was conducted pursuant to the Restriction Fragment Length Polymorphisms (RFLP) method; (2) the RFLP method is accepted in the scientific community; (3) the NRC report does not question the validity of the RFLP process;[9] (4) FDLE analysts are subject to routine proficiency testing, and the analyst in this case has never failed a proficiency test; and finally, (5) FDLE has in place written quality control procedures which are consistent with NRC recommendations.[10]
In Hayes, we stated that DNA testing procedures conducted in a case must meet the Frye test for reliability before the DNA test results can be admitted at trial. Hayes, 660 So.2d at 264. Our decision sets forth NRC recommendations as an example of testing procedures that meet the Frye test for reliability. Id. at 263. However, contrary to Henyard's assertion, Hayes does not hold that testing procedures which do not meet NRC recommendations are per se unreliable and thereby render the test results inadmissible. In light of our decisions in Robinson and Hayes, and based on the evidence offered at the Frye hearing, we find that the trial court did not abuse its discretion in admitting the results of FDLE's DNA analysis at trial.

The Prosecutor's Misstatements of Law and Improper Argument
First, Henyard claims the trial court erred in allowing the prosecutor to instruct several prospective jurors during voir dire that "[i]f the evidence of the aggravators outweighs the mitigators by law your recommendation must be for death."
In Alvord v. State, 322 So.2d 533, 540 (Fla.1975), cert. denied, 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976), we stated:
Certain factual situations may warrant the infliction of capital punishment, but, nevertheless, would not prevent either the trial jury, the trial judge, or this Court from exercising reasoned judgment in reducing the sentence to life imprisonment. Such an exercise of mercy on behalf of the defendant in one case does not prevent the imposition of death by capital punishment in the other case.
See also Gregg v. Georgia, 428 U.S. 153, 203, 96 S.Ct. 2909, 2939, 49 L.Ed.2d 859 (1976) (stating that jury can constitutionally dispense mercy in case deserving of death penalty). Thus, a jury is neither compelled nor *250 required to recommend death where aggravating factors outweigh mitigating factors.
In this case, we agree with Henyard that the prosecutor's comments that jurors must recommend death when aggravating circumstances outweigh mitigating circumstances were misstatements of law. But, contrary to Henyard's assertions,[11] we do not find that he was prejudiced by this error. Initially, we note the comments occurred on only three occasions during an extensive jury selection process. Moreover, the misstatement was not repeated by the trial court when instructing the jury prior to their penalty phase deliberations. In fact, the jury was advised that the statements of the prosecutor and defense lawyer were not to be treated as the law or the evidence upon which a decision was to be based. Further, Henyard does not contend that the jury was improperly instructed before making an advisory sentence recommendation in the penalty phase of his trial. In this context, we find the prosecutor's isolated misstatements during jury selection to be harmless error. State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
Next, Henyard contends that the prosecutor made a false statement during his closing argument. The complained-of argument is as follows:
And then they [defense counsel] will tell you he was cooperative when he went to the police. He eventually told them what happened and he told them that he didn't kill the girls. And my first thought in that regard is, does it matter how many times you tell a lie for it to become the truth? Because I say it nineteen times or nineteen thousand times, does it make it so? And we all know it doesn't. You have to look at everything that is going on and see in that same story he is telling them, I never raped anybody.
Henyard contends that the prosecutor's argument was improper because the prosecutor characterized the defendant as a liar by intimating that Henyard never admitted to the rape when, in fact, he did admit that he raped Ms. Lewis in his final statement made to police. We disagree. As previously noted, see supra note 7, Henyard made three confessions at the Eustis Police Department on the day following the murder of the Lewis girls, but only his first statement was admitted against him at trial. In his first statement, Henyard confessed that he abducted Ms. Lewis and her children and drove them to a deserted area where he shot Ms. Lewis in the leg and head, but denied that he raped Ms. Lewis or killed her daughters. In his last statement, Henyard finally confessed that he did rape Ms. Lewis, but continued to deny that he killed her daughters.
When the prosecutor's closing argument is read in its entirety and fairly considered, it is clear that the prosecutor was referring to Henyard's lack of candor and failure to be completely forthcoming about his involvement in the offense when he initially confessed, and was not making a bad faith argument which implied that Henyard never confessed to the sexual battery of Ms. Lewis. In essence, the prosecutor argued to the jury that because the state had offered evidence at trial[12] which clearly contradicted and discredited Henyard's initial assertion that he did not rape Ms. Lewis, the jury should not believe Henyard's further assertions that he also did not kill Jasmine and Jamilya Lewis. We find that the prosecutor's argument was a legitimate comment on *251 the truthfulness, or lack thereof, of Henyard's claim of innocence, and, contrary to Henyard's assertion, was not improper.

The Admissibility of Ms. Lewis's Hearsay Statements
Henyard contends that the trial court erred by allowing a Eustis police officer to testify to statements Ms. Lewis made to him under the excited utterance exception to the hearsay rule because her statements were inadmissible hearsay. We again disagree.
In order for a hearsay statement to be admissible as an excited utterance under section 90.803(2), Florida Statutes (1995) the statement: (1) must have been made regarding an event startling enough to cause nervous excitement; (2) must have been made before there was time to contrive or misrepresent; and (3) must have been made while the person was under the stress or excitement caused by the event. State v. Jano, 524 So.2d 660, 661 (Fla.1988). While the length of time between the event and the statement is a factor to be considered in determining whether the statement may be admitted under the excited utterance exception, id. at 662, the immediacy of the statement is not a statutory requirement. See § 90.803(2).
In the early morning hours of Sunday, January 31, a Eustis police officer responded to a call for help concerning a woman covered with blood who had collapsed on the front porch of a home near Hicks Ditch Road. When the officer arrived, he found Ms. Lewis, who was hysterical but coherent. At trial, the officer was permitted to recount statements Ms. Lewis made to him on the front porch immediately after his arrival. The police officer testified that Ms. Lewis told him she had been raped and shot, identified her assailants as two young black males who fit the description of Henyard and Smalls, and said they had taken her children. Given these circumstances, we find that Ms. Lewis was still experiencing the trauma of the events she had just survived when she spoke to the officer and her statements were properly admitted under the excited utterance exception to the hearsay rule.
Even assuming arguendo that Ms. Lewis's statements were not properly admitted, we find the error harmless. Ms. Lewis also testified at length at Henyard's trial, identifying him as one of her assailants and describing the clothing he was wearing when he abducted her and her children. Because the officer's testimony concerning Ms. Lewis's statements was nothing more than a generalization of specific information which Ms. Lewis testified to at trial from her own personal knowledge, we find that any error in allowing him to testify to Ms. Lewis's statements is harmless beyond a reasonable doubt. State v. DiGuilio, 491 So.2d 1129 (Fla.1986).

The Admissibility of Penalty Phase Evidence
First, Henyard claims that the trial court erred in allowing the state at the penalty phase to present evidence of his prior juvenile adjudication for armed robbery with a weapon which the trial court specifically relied on to find the prior violent felony aggravating circumstance. See § 921.141(5)(b), Fla. Stat. (1995).[13] We agree.
In Merck v. State, 664 So.2d 939 (Fla. 1995), the defendant was convicted of first-degree murder, and at his sentencing trial the State introduced evidence of Merck's prior juvenile adjudication in North Carolina for assault with a deadly weapon. Id. at 943-44. The jury recommended death and the trial court followed the recommendation, finding Merck's juvenile adjudication to be an aggravating factor under section 921.141(5)(b). Id. at 941, 943. We reversed the death sentence and explained:
[W]e agree with Merck that the juvenile adjudication was not a conviction within the meaning of section 921.141(5)(b), Florida *252 Statutes (1993). This is expressly mandated in section 39.053, Florida Statutes (1993).... Despite correctly sustaining the objection to the admissibility of the North Carolina judgment, the trial court erred in stating in her sentencing order, "This is also a proper aggravating factor under [section] 921.141(5)(b)." We find the inclusion of this juvenile adjudication similar to the erroneous inclusion of community control as an aggravating factor in Trotter v. State, 576 So.2d 691 (Fla.1990). As noted in Trotter, penal statutes must be strictly construed in favor of the one against whom a penalty is imposed. Id. at 694. We therefore conclude as we did in Trotter, that a resentencing before a jury is required.
... We acknowledge that there was other substantial evidence to support the aggravating factor in section 921.141(5)(b). Nevertheless, from our review of the record we cannot say that the dramatic testimony concerning the North Carolina shooting did not taint the recommendation of the jury.
Id. at 944. As we indicated in Merck, section 39.053(4), Florida Statutes (1995), expressly states: "Except as the term `conviction' is used in chapter 322, and except for use in a subsequent proceeding under this chapter, an adjudication of delinquency by a court with respect to any child who has committed a delinquent act or violation of law shall not be deemed a conviction...." Thus, Henyard's prior juvenile adjudication for robbery with a weapon is not a "conviction" for a prior violent felony. Consequently, in light of our recent decision in Merck, and the plain language of section 921.141(5)(b), which requires that the defendant be "previously convicted" of a violent felony for it to be considered in aggravation, we find the trial court erred in relying upon Henyard's juvenile adjudication for robbery to support the prior violent felony aggravating factor.
Nevertheless, we reject Henyard's claim that the trial court's improper consideration of Henyard's prior juvenile adjudication as a violent felony entitles him to a new sentencing hearing. Unlike the violent felony adjudication at issue in Merck, the testimony concerning Henyard's juvenile adjudication was modest and served to minimize his role in the prior offense.[14] Moreover, the record reflects without dispute the presence of six other contemporaneous felony convictions of Henyard to support the prior violent felony aggravator for each death sentence even absent Henyard's juvenile adjudication for robbery with a weapon.[15] Accordingly, we find the trial court's improper admission into evidence and consideration of Henyard's juvenile adjudication for robbery with a weapon to be harmless beyond a reasonable doubt. State v. DiGuilio, 491 So.2d at 1129.
Second, Henyard contends that the trial court erred in allowing Ms. Lewis to testify during the penalty phase that Henyard, upon hearing Ms. Lewis' prayers to Jesus, stated, "You might as well stop calling Jesus, this ain't Jesus this is Satan." Henyard *253 claims his statement is not relevant to prove the existence of any aggravating circumstance. We disagree.
Under Florida law, the heinous, atrocious, or cruel aggravating circumstance may be proven in part by evidence of the infliction of "mental anguish" which the victim suffered prior to the fatal shot. See, e.g., Preston v. State, 607 So.2d 404, 409-10 (Fla. 1992); Phillips v. State, 476 So.2d 194, 196 (Fla.1985); Routly v. State, 440 So.2d 1257, 1265-66 (Fla.1983), cert. denied, 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 888 (1984). In this case, Ms. Lewis testified that she was sitting in the back seat between her daughters, that her girls were quiet at the time Henyard made the statement at issue, and that Henyard spoke loudly enough for all to hear. Ms. Lewis explained that neither child had trouble hearing and she believed her daughters heard Henyard's statement. Thus, Henyard's statement, which the trial court characterized as the "harbinger" of the agonizing events to come, was relevant to show the mental anguish inflicted upon the Lewis girls before they were killed, and as evidence of the heinous, atrocious and cruel aggravating circumstance. Consequently, we find that the trial court properly admitted the statement into evidence during the penalty phase of Henyard's trial.
Finally, Henyard claims the trial court erred in admitting the testimony of a blood stain pattern analyst because it was not relevant to prove the existence of any aggravating circumstance. The analyst testified that, based on the blood splatters found on Henyard's clothing, Henyard was approximately four feet from Jamilya Lewis when she was shot.
In this case, Henyard offered evidence that he was not the triggerman in these murders and argued that lingering doubt as to whether he actually shot the Lewis girls should be considered in mitigation. Consequently, the testimony of the State's witness concerning blood-splatter evidence was proper to rebut Henyard's continued assertion that he did not actually kill the Lewis girls. Moreover, testimony concerning the close proximity of the defendant to the victim was relevant to show the "nature of the crime." See § 921.141(1), Fla. Stat. (1995). Thus, we find that the trial court did not abuse its discretion in allowing the blood stain analyst to testify at the penalty phase of Henyard's trial.

The Pecuniary Gain and Heinous, Atrocious, or Cruel Aggravating Factors
Henyard claims that the trial court erred in finding the pecuniary gain aggravating circumstance in this case because the evidence was insufficient to prove this aggravating factor beyond a reasonable doubt. In Hardwick v. State, 521 So.2d 1071, 1076 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 185, 102 L.Ed.2d 154 (1988), we held that in order for the pecuniary gain aggravating factor to be present, there must be proof beyond a reasonable doubt that the murder was an "integral step in obtaining some sought-after specific gain."
Here, the trial court found that, during the week preceding the murders, Henyard "stated he was going to get himself a car," and "foretold or bragged on Friday evening[,] January 29, 1993[,] that he would steal someone's car, kill the owner and use the car to drive to Pahokee to see his father." The following evening, Henyard and his codefendant stole Ms. Lewis's car and abducted the Lewis family, raped and attempted to murder Ms. Lewis, and killed her children, Jasmine and Jamilya Lewis. Henyard's admissions and the facts of this case support a finding that the murders of Jasmine and Jamilya Lewis were "an integral step in obtaining some sought after specific gain." See Hardwick, 521 So.2d at 1076. Thus, the trial court did not err in finding the pecuniary gain aggravating factor to be proved beyond a reasonable doubt in this case. See also Gamble v. State, 659 So.2d 242 (Fla.1995)(pecuniary gain aggravator found when codefendants stole victim's car after murdering him), cert. denied, ___ U.S. ___, 116 S.Ct. 933, 133 L.Ed.2d 860 (1996); Hall v. State, 614 So.2d 473 (Fla.) (pecuniary gain aggravator found when victim was abducted, beaten, raped, and murdered and car was stolen), *254 cert. denied, 510 U.S. 834, 114 S.Ct. 109, 126 L.Ed.2d 74 (1993).
Second, Henyard contends that the trial court erred in finding the heinous, atrocious, or cruel aggravating circumstance in this case because each child was killed with a single gunshot, and "if the victims were adults, heinous, atrocious, [or] cruel would not be present on this record." We disagree.
We have previously upheld the application of the heinous, atrocious, or cruel aggravating factor based, in part, upon the intentional infliction of substantial mental anguish upon the victim. See, e.g., Routly v. State, 440 So.2d 1257, 1265 (Fla.1983), and cases cited therein. Moreover, "[f]ear and emotional strain may be considered as contributing to the heinous nature of the murder, even where the victim's death was almost instantaneous." Preston v. State, 607 So.2d 404, 410 (Fla.1992), cert. denied, 507 U.S. 999, 113 S.Ct. 1619, 123 L.Ed.2d 178 (1993). In this case, the trial court found the heinous, atrocious or cruel aggravating factor to be present based upon the entire sequence of events, including the fear and emotional trauma the children suffered during the episode culminating in their deaths and, contrary to Henyard's assertion, not merely because they were young children.[16] Thus, we find the trial court properly found that the heinous, atrocious, or cruel aggravating factor was proved beyond a reasonable doubt in this case.

The Proportionality of the Death Penalty
As his final claim, Henyard argues that his death sentences are disproportionate to the sentence received by his codefendant, Alfonza Smalls, and that the mitigating factors in his case outweigh the aggravating factors.
Under Florida law, when a codefendant is equally culpable or more culpable than the defendant, disparate treatment of the codefendant may render the defendant's punishment disproportionate. Downs v. State, 572 So.2d 895 (Fla.1990), cert. denied, 502 U.S. 829, 112 S.Ct. 101, 116 L.Ed.2d 72 (1991); Slater v. State, 316 So.2d 539 (Fla. 1975). Thus, an equally or more culpable codefendant's sentence is relevant to a proportionality analysis. Cardona v. State, 641 So.2d 361 (Fla.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1122, 130 L.Ed.2d 1085 (1995).
Like Henyard, Alfonza Smalls was tried on the same charges and convicted, but he was not subject to the death penalty because his age of fourteen at the time of the offense prevented him from receiving the death penalty as a matter of law. Rather, Smalls received the maximum sentence possible for his crimeseight consecutive life sentences, with a fifty-year mandatory minimum for the two first-degree murder convictions.
In Allen v. State, 636 So.2d 494, 497 (Fla.1994), we held that the death penalty is either cruel or unusual punishment under article I, section 17 of the Florida Constitution if imposed upon a person who is under the age of sixteen when committing the crime. That is, when a defendant is under the age of sixteen, his or her youth is such a substantial mitigating factor that it cannot be outweighed by any set of aggravating circumstances as a matter of law.
In this context, then, Smalls' less severe sentence is irrelevant to Henyard's proportionality review because, pursuant to Allen, the aggravation and mitigation in their cases are per se incomparable. Under the law, death was never a valid punishment option for Smalls, and Henyard's death sentences are not disproportionate to the sentence received *255 by his codefendant. Cf. Larzelere v. State, 676 So.2d 394 (Fla.1996)(holding that codefendant's acquittal was irrelevant to proportionality review of defendant's death sentence because codefendant was exonerated from culpability as a matter of law).
We also find that the evidence in Henyard's case supports the trial court's conclusion that the four aggravating factors outweighed the mitigating factors set forth in the sentencing order.[17] Finally, upon consideration of all of the circumstances, we further conclude that Henyard's death sentences are not disproportionate to death sentences imposed in other cases. See, e.g., Walls v. State, 641 So.2d 381, 391 (Fla.1994)(death sentence upheld for execution-style killing of woman after she witnessed boyfriend's murder), cert. denied, ___ U.S. ___, 115 S.Ct. 943, 130 L.Ed.2d 887 (1995); Cave v. State, 476 So.2d 180 (Fla.1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986)(death sentence proportionate where co-perpetrators abducted, raped, and killed victim; defendant not actual killer).
Accordingly, we affirm Henyard's convictions and the imposition of the sentences of death in this case.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, GRIMES, HARDING, WELLS and ANSTEAD, JJ., concur.
NOTES
[1] Linda Miller is not actually Richard Henyard's aunt.
[2] In its sentencing order, the trial court incorrectly characterized these "mental mitigators" as nonstatutory mitigating circumstances.
[3] In Allen v. State, 636 So.2d 494 (Fla.1994), we held that the death penalty is either cruel or unusual punishment under article I, section 17 of the Florida Constitution if imposed upon a person who is under the age of sixteen when he or she commits a capital crime. Id. at 497. Because Alfonza Smalls was fourteen years of age at the time of the offense, he is ineligible to receive the death penalty as a matter of law.
[4] The eleven claims are: (1) The trial court abused its discretion in failing to grant Henyard's motions for a change of venue; (2) The trial court erred when it (a) granted the state's challenge for cause of one prospective juror (who stated he could not, under any circumstances, recommend a death sentence for Henyard because of his youth), and (b) refused to excuse three prospective jurors Henyard challenged for cause; (3) The trial court erred in denying Henyard's motions to suppress his statement to the police because the interrogating officers failed to honor Henyard's request to cease questioning in violation of his right to remain silent under article I, section 9 of the Florida Constitution; (4) The trial court abused its discretion in admitting DNA evidence which was not supported by a proper predicate of reliability; (5) The trial court erred by (a) allowing the state, during voir dire, to tell prospective jurors that if the evidence of aggravators outweighed the evidence of mitigators then the jury's sentence recommendation must be for death as a matter of law, and (b) suggesting during closing argument that Henyard never admitted to raping Ms. Lewis when, in fact, he did confess to raping her in his third confession to police on the day after the murders; (6) The trial court erred in allowing a police officer to testify as to hearsay statements Ms. Lewis made to him when he came to her aid after the offense; (7) The trial court erred by giving the standard jury instructions on premeditated murder and reasonable doubt, and by failing to give the jury a special verdict form on the theory of guilt; (8) The trial court erred during the penalty phase by (a) instructing the jury on the avoid arrest aggravator, (b) expressly considering as an aggravator, and allowing the jury to hear, evidence of Henyard's prior juvenile adjudication for robbery with a weapon, and (c) allowing Ms. Lewis and Leroy Parker to testify at the penalty phase because their testimony did not tend to prove any statutory aggravating circumstance; (9) The trial court abused its discretion in denying Henyard's specially requested penalty-phase jury instruction on the heinous, atrocious or cruel aggravating circumstance, which instructed on "tortuous intent," and further erred by giving the standard heinous, atrocious or cruel instruction, which is unconstitutionally vague and overbroad; (10) The trial court erred by relying upon two aggravating circumstances pecuniary gain and heinous, atrocious or cruel as support for Henyard's death sentences because they were not proven beyond a reasonable doubt; and (11) the death penalty is not proportionally warranted in this case.
[5] As to Henyard's claim that the premeditated murder instruction is deficient, see Spencer v. State, 645 So.2d 377, 382 (Fla.1994). As to the claim that the reasonable doubt instruction is deficient, see Spencer, 645 So.2d at 382; Esty v. State, 642 So.2d 1074, 1078-79 (Fla.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1380, 131 L.Ed.2d 234 (1995); Brown v. State, 565 So.2d 304, 307 (Fla.), cert. denied, 498 U.S. 992, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990). Finally, as to Henyard's claim that a special verdict form on the theory of guilt was required, see Patten v. State, 598 So.2d 60 (Fla.1992), cert. denied, 507 U.S. 1019, 113 S.Ct. 1818, 123 L.Ed.2d 448 (1993); Jones v. State, 569 So.2d 1234 (Fla. 1990).
[6] As to Henyard's claim that he was entitled to his requested instruction containing the element of "tortuous intent," see Taylor v. State, 638 So.2d 30, 33 n. 4 (Fla.), cert. denied, 513 U.S. 1003, 115 S.Ct. 518, 130 L.Ed.2d 424 (1994). As to Henyard's claim that the standard heinous, atrocious or cruel instruction is constitutionally deficient, see Johnson v. State, 660 So.2d 637, 648 (Fla.1995), cert. denied, ___ U.S. ___, 116 S.Ct. 1550, 134 L.Ed.2d 653 (1996); Hannon v. State, 638 So.2d 39, 43 (Fla.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1118, 130 L.Ed.2d 1081 (1995); Preston v. State, 607 So.2d 404, 410 (Fla.1992), cert. denied, 507 U.S. 999, 113 S.Ct. 1619, 123 L.Ed.2d 178 (1993); Power v. State, 605 So.2d 856, 864-65 (Fla.1992), cert. denied, 507 U.S. 1037, 113 S.Ct. 1863, 123 L.Ed.2d 483 (1993).
[7] Henyard made three, independent confessions to law enforcement officers on the day after the Lewis children were murdered. At the suppression hearing, the trial court deemed all three of Henyard's statements to be admissible against him, but only Henyard's initial confession was admitted against him at trial. Henyard contends that all three confessions were obtained in violation of his right to remain silent, and urges us to address the trial court's alleged error in finding his second and third statements to be admissible, even though he was not prejudiced by the ruling. Because we affirm his convictions and sentences, we decline to address whether the trial court erred in finding admissible Henyard's last two statements which the state did not offer into evidence at trial.
[8] Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923).
[9] See also Hayes, 660 So.2d at 263.
[10] Henyard's claim that the DNA testing procedure is unreliable because the FDLE laboratory is not accredited is somewhat misleading. In 1989 when the FDLE lab last underwent accreditation review, the lab did not perform DNA testing. The accreditation period is five years, and the lab was scheduled for reinspection and reaccreditation in the fall of 1994, several months after Henyard's trial.
[11] Henyard contends that the prejudicial nature of this error is evidenced by the fact that the advisory recommendation forms contained three different vote totals, one, 10 to 2, which is crossed out and replaced with 11 to 1, which is in turn crossed out and then recorded 12 to 0. Henyard argues, "While we cannot speculate on what caused this to occur, it certainly could have been due to the fact that at least two of the jurors simply wanted to exercise mercy and recommend life, yet were reminded by the other jurors that the prosecutor had told them if the aggravating factors outweigh the mitigating they had to vote for death." Initial Brief at 54. As Henyard concedes, this theory is wholly speculative and therefore is not appropriate for consideration when determining whether reversible error has occurred.
[12] On the night of the offense, Ms. Lewis was taken to the Orlando Regional Medical Center where she underwent surgery for gunshot wounds and a rape examination. Vaginal swabs collected for the rape test showed the presence of semen which, when compared with Henyard's DNA, provided for a match in a statistical probability of 1 in 809 million persons.
[13] Section 921.141(5) states:

AGGRAVATING CIRCUMSTANCES.Aggravating circumstances shall be limited to the following:
. . . .
(b) The defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person.
[14] Henyard's court-appointed attorney in the juvenile matter testified in pertinent part:

The circumstances were it was a strong armed robbery that had a weapon involved, as far as like a broomstick, of a convenience store. And it was Larry Hayes who was the one who actually accosted the lady and who threatened her with the stick and grabbed the money. It was Mr. Henyard and Columbus Connley who were out there by the door just as a lookout at most. I thought Mr. Henyard was the least culpable of the three.
[15] In conclusory fashion, Henyard argues that, to the extent that the contemporaneous convictions are considered under the prior violent felony aggravator, the trial court has improperly doubled this aspect with the aggravating circumstance that the murder was committed in the course of a kidnapping. See Provence v. State, 337 So.2d 783, 786 (Fla.1976) (evidence used to support two independent aggravating circumstances cannot refer to the same aspect of defendant's crime), cert. denied, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977). In this case, the trial court imposed death sentences for the murders of both Jasmine and Jamilya Lewis. For each death sentence, the trial court considered the contemporaneous conviction for the kidnapping of the other sister under the prior violent felony aggravating factor, and considered the victim's kidnapping under the murder in the course of a felony aggravating factor. See § 921.141(5)(d). That is, the trial court considered different aspects of Henyard's crime in finding these two aggravators for each murder. Thus, the presence of these aggravators does not constitute improper doubling and Henyard's claim is without merit.
[16] The sentencing order reads in pertinent part:

After shooting Ms. Lewis, Henyard and Smalls rolled Ms. Lewis' unconscious body off to the side of the road. Henyard got back into Ms. Lewis' car and drove a short distance down the deserted road, whereupon Henyard stopped the car.
Jasmine and Jamilya, who had been in continual close approximation and earshot of the rapes and shooting of their mother, were continuing to plead for their mother; "I want my Mommy," "Mommy," "Mommy."
After stopping the car, Henyard got out of Ms. Lewis' vehicle and proceeded to lift Jasmine out of the back seat of the car, Jamilya got out without help. Then both of the pleading and sobbing sisters, were taken a short distance from the car, where they were then executed, each with a single bullet to the head.
[17] Henyard does not contend that the trial court failed to consider any mitigating evidence presented in this case.