[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 11, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-15110

_____

D. C. Docket No. 04-00621-CV-OC-10GRJ

RICHARD HENYARD,

Petitioner-Appellant,

versus

JAMES MCDONOUGH,
Secretary, Florida Department
of Corrections,
CHARLIE CRIST,
Florida Attorney General,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(August 11, 2006)**

Before BIRCH, BARKETT and HULL, Circuit Judges.

PER CURIAM:

In this capital case, Richard Henyard appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. We review this petition on the three grounds specified in our Certificate of Appealability: (1) whether the state trial court's denial of petitioner's motion to suppress certain statements violated his right against self-incrimination; (2) whether the trial court's denial of petitioner's request for a change of venue denied him a fair trial by an impartial jury; and (3) whether trial counsel's failure to present certain mitigating evidence during the penalty phase constituted ineffective assistance of counsel. After review and oral argument, we affirm.

## I.  BACKGROUND

In June 1994, a jury in the Circuit Court of Lake County, Florida, convicted Henyard of multiple crimes, including the carjacking of Dorothy Lewis and her two children, Jasmine, age 3, and Jamilya, age 7; the first degree murder of Jasmine and Jamilya Lewis; and the rape and attempted murder of Dorothy Lewis. The jury unanimously recommended, and the trial court imposed, a sentence of death.

The Florida Supreme Court denied Henyard's direct appeal and affirmed Henyard's conviction and death sentence in 1996. Henyard v. State, 689 So.2d

2

239 (Fla. 1996). In so doing, the Florida Supreme Court summarized the trial evidence of Henyard's crimes as follows:

The record reflects that one evening in January, 1993, eighteen-year-old Richard Henyard stayed at the home of a family friend, Luther Reed. While Reed was making dinner, Henyard went into his bedroom and took a gun that belonged to Reed. Later that month, on Friday, January 29, Dikeysha Johnson, a long-time acquaintance of Henyard, saw him in Eustis, Florida. While they were talking, Henyard lifted his shirt and displayed the butt of a gun in the front of his pants. Shenise Hayes also saw Henyard that same evening. Henyard told her he was going to a night club in Orlando and to see his father in South Florida. He showed Shenise a small black gun and said that, in order to make his trip, he would steal a car, kill the owner, and put the victim in the trunk.

William Pew also saw Henyard with a gun during the last week in January and Henyard tried to persuade Pew to participate in a robbery with him. Later that day, Pew saw Henyard with Alfonza Smalls, a fourteen-year-old friend of Henyard's. Henyard again displayed the gun, telling Pew that he needed a car and that he intended to commit a robbery at either the hospital or the Winn Dixie.

Around 10 p.m. on January 30, Lynette Tschida went to the Winn Dixie store in Eustis. She saw Henyard and a younger man sitting on a bench near the entrance of the store. When she left, Henyard and his companion got up from the bench; one of them walked ahead of her and the other behind her. As she approached her car, the one ahead of her went to the end of the bumper, turned around, and stood. Ms. Tschida quickly got into the car and locked the doors. As she drove away, she saw Henyard and the younger man walking back towards the store.

At the same time, the eventual survivor and victims in this case, Ms. Lewis and her daughters, Jasmine, age 3, and Jamilya, age 7, drove to the Winn Dixie store. Ms. Lewis noticed a few people sitting on a bench near the doors as she and her daughters entered the store.

3

When Ms. Lewis left the store, she went to her car and put her daughters in the front passenger seat. As she walked behind the car to the driver's side, Ms. Lewis noticed Alfonza Smalls coming towards her. As Smalls approached, he pulled up his shirt and revealed a gun in his waistband. Smalls ordered Ms. Lewis and her daughters into the back seat of the car, and then called to Henyard. Henyard drove the Lewis car out of town as Smalls gave him directions.

The Lewis girls were crying and upset, and Smalls repeatedly demanded that Ms. Lewis "shut the girls up." As they continued to drive out of town, Ms. Lewis beseeched Jesus for help, to which Henyard replied, "this ain't Jesus, this is Satan." Later, Henyard stopped the car at a deserted location and ordered Ms. Lewis out of the car. Henyard raped Ms. Lewis on the trunk of the car while her daughters remained in the back seat. Ms. Lewis attempted to reach for the gun that was lying nearby on the trunk. Smalls grabbed the gun from her and shouted, "you're not going to get the gun, bitch." Smalls also raped Ms. Lewis on the trunk of the car. Henyard then ordered her to sit on the ground near the edge of the road. When she hesitated, Henyard pushed her to the ground and shot her in the leg. Henyard shot her at close range three more times, wounding her in the neck, mouth, and the middle of the forehead between her eyes. Henyard and Smalls rolled Ms. Lewis's unconscious body off to the side of the road, and got back into the car. The last thing Ms. Lewis remembers before losing consciousness is a gun aimed at her face. Miraculously, Ms. Lewis survived and, upon regaining consciousness a few hours later, made her way to a nearby house for help. The occupants called the police and Ms. Lewis, who was covered in blood, collapsed on the front porch and waited for the officers to arrive.

As Henyard and Smalls drove the Lewis girls away from the scene where their mother had been shot and abandoned, Jasmine and Jamilya continued to cry and plead: "I want my Mommy," "Mommy," "Mommy." Shortly thereafter, Henyard stopped the car on the side of the road, got out, and lifted Jasmine out of the back seat while Jamilya got out on her own. The Lewis girls were then taken into a grassy area along the roadside where they were each killed by a single bullet fired into the head. Henyard and Smalls threw the bodies of Jasmine and

Jamilya Lewis over a nearby fence into some underbrush.

. . . .

The autopsies of Jasmine and Jamilya Lewis showed that they both died of gunshot wounds to the head and were shot at very close range. Powder stippling around Jasmine's left eye, the sight of her mortal wound, indicated that her eye was open when she was shot. One of the blood spots discovered on Henyard's socks matched the blood of Jasmine Lewis. "High speed" or "high velocity" blood splatters found on Henyard's jacket matched the blood of Jamilya Lewis and showed that Henyard was less than four feet from her when she was killed. Smalls' trousers had "splashed" or "dropped blood" on them consistent with dragging a body. DNA evidence was also presented at trial indicating that Henyard raped Ms. Lewis.

Henyard v. State, 689 So.2d at 242-45.

## A. Henyard's Confession

At 9 a.m. on January 31, 1993, the petitioner Henyard went with his "auntie" Linda Miller and her friend Annie Neal to a laundromat. The laundromat was located next door to the Winn Dixie supermarket where Henyard and Smalls, roughly eleven hours earlier, had abducted the victims. Before washing their clothes, Neal and Miller went into that Winn Dixie to buy laundry supplies.

In the Winn Dixie, police officer Adam Donaldson was asking patrons if they knew anything about the double murder and rape from the night before. Officer Donaldson recognized Neal because she previously had provided information to the police, at times for money. Officer Donaldson summoned Neal

5

to him, told Neal about the murders and mentioned that there was a reward for any information about the crime. Officer Donaldson asked Neal "to keep her ears open."

After returning to the laundromat, Neal and Miller spoke about the double murder investigation in the presence of Henyard. Neal mentioned some of what she had learned from Officer Donaldson, including that the mother had survived the shooting. Henyard then volunteered that he knew something about the crime. Neal responded by telling Henyard, "let's go out and investigate because they got a thousand-dollar reward." Henyard agreed.

Neal and Henyard drove from the laundromat to Neal's house. After they dropped Neal's clothes off, Henyard asked Neal to drive him to Alfonza Smalls's house "because they found the car and they [are] dusting for fingerprints." Neal drove Henyard to Smalls's house, where the two had a conversation that Neal did not overhear.

On the drive away from Smalls's house, Neal and Henyard passed near the crime scene and saw police officers investigating the murders. Unprompted by Neal, Henyard asked Neal to drive him to the police station. At the police station, Henyard got out of the car of his own accord. In the parking lot, Neal spotted Officer Wayne Perry, an officer she recognized. Neal then "hollered Wayne

6

down," telling him that "Rick [Henyard] got something to tell you."

Henyard approached Officer Perry, telling him without prompting that he had witnessed the Lewis murders but that he "didn't do it." Officer Perry escorted Henyard inside the police station for further questioning. Henyard was not placed under arrest or handcuffed, and he followed Officer Perry into the station on his own volition.[1]

Henyard was questioned for three and a half hours by a number of law enforcement officers, including Donald Dowd and other FBI agents, Robert O'Connor of the Florida Department of Law Enforcement, and Robert Hart and Scott Barker of the Eustis Police Department. Initially, the officers considered Henyard a witness and not a suspect because he had arrived at the police station voluntarily and had claimed not to have committed the crimes. Consequently, the officers did not read Henyard his rights at this time. However, the officers' suspicions quickly grew that Henyard was responsible for the murders.

Henyard's meeting with the officers at the police station began at about 1:00 p.m. on January 31, 1993. Henyard initially told the officers that at 1:00 a.m. that

---

[1]In his brief, Henyard asserts that Neal, a police informant, "tricked" him into visiting the police station. We reject this allegation. At the suppression hearing, Neal testified that Henyard himself proposed the visit to the police and directed her to take him to the police station. Moreover, during the interrogation, Henyard himself acknowledged that he had approached the police voluntarily.

morning, Emmanuel Yon and Alfonza Smalls had picked Henyard up in a blue Chrysler and the three had driven to a night club. Henyard stated that at the club, Yon and Smalls confessed to him that they "had went down to Winn Dixie and stole a car and shot the lady and her two children." Henyard claimed that because he had no other way to get home from the club, he had remained at the club for a while with Yon and Smalls, and then drove them home in the car at around 4:30 or 5:00 a.m.

As soon as Henyard told the police that he had driven Ms. Lewis's car, one of the FBI agents suggested that Henyard could be charged as an accessory after the fact. The agent told Henyard, "you've got to stand up and do the right thing." Henyard agreed with the officer and commented that he felt the need to talk to the police "because I know my fingerprints in that car and I'm on probation." The agent responded that "the best thing you can do right now is – is to come clean with the whole thing."

At the officers' prompting, Henyard retold in greater detail his fabricated story about Yon and Smalls. Apparently suspecting that Henyard was not being truthful, one of the agents interrupted him, and this exchange occurred:

FBI Agent: All right. Look, let me tell you something right now. Are you involved in a murder?
Henyard: No, I am not.
Agent: Huh? Are you sure you're not involved in a murder?

8

|          | Huh? |
|----------|------|
| Henyard: | Yes, Sir. |
| Agent:   | Absolutely certain you're not involved in a murder? |
| Henyard: | Yes, Sir. |
| Agent:   | The first one that talks gets the best deal in every case, you know that, okay? |

Because Henyard steadfastly denied involvement in the murder, the agent asked if Henyard would be willing to take a polygraph test. Henyard said that he "would not take one without the presence of my auntie."

At the officers' prompting, Henyard continued to add details to his fabricated story, mostly concerning who Yon and Smalls were, how Henyard knew them, and where they lived and "hung out." At about 1:30 p.m., the officers decided that Henyard would need to remain in police custody, as indicated by this colloquy:

| FBI Agent: | Is there any place we can put him that we can put somebody with him? |
|------------|------|
| Off. Hart: | Uh-huh. |
| Agent:     | Why don't we do that. |
| Henyard:   | What's that? |
| Agent:     | You're going to have to stay here for awhile, okay? |
| Henyard:   | How long is a while? |
| Agent:     | Just for a little while, because we're going to talk to you some more, okay, but we've got to talk among ourselves first and then we've got to talk to you, okay? |

Henyard then inquired twice more about the possibility of leaving:

| Henyard:   | Can I go home soon, man? |
|------------|------|
| Off. Hart: | Soon. You know how these federal people are, though. |

They're not like us local boys.

. . .

Henyard:     Excuse me, sir.  How long am I gonna have to stay here?
Agent:        Huh?
Henyard:     How long do I have to stay here?
Agent:        Ah, just a few more minutes.

Immediately after these exchanges, the law enforcement officers confirmed that Henyard could read and write, had reached the eleventh grade in school, and was eighteen years old.  The officers then read Henyard his Miranda rights.  At about 1:30 p.m., Henyard affirmed that he understood his rights and that he wished to waive his rights, and he signed the rights waiver form.

Shortly after Henyard's Mirandized interrogation began, the law enforcement officials again asked Henyard if he would be willing to take a polygraph test.  Henyard said that he would not do so "[w]ithout the presence of my auntie."  The officers offered to bring Henyard's auntie into the station, but told Henyard that "[s]he can't stay in here while you're taking a polygraph."  Henyard responded, "[t]hen I won't take it.  I want my auntie sitting right beside me when I take it."

The officers promised to try to find Henyard's auntie and bring her to the station.  This exchange then transpired:

Agent:        After you talk to [your auntie] – Don't you want to

10

|              |                                                           |
|--------------|-----------------------------------------------------------|
|              | resolve this right now?                                   |
| Henyard:     | Yes, I do.                                                |
| Agent:       | Okay. You just hang out here. What else you going to do? You going to hang out at the Manors, you can hang out here, okay? |
| Henyard:     | Huh?                                                       |
| Agent:       | You just stay here a minute – you know, we can't force you to stay here (inaudible). |
| Henyard:     | Take me to my auntie's house.                             |
| Agent:       | We're going to have your aunt come down here.            |
| Henyard:     | Y'all (Inaudible).                                        |
| Agent:       | Yeah, we're going to have –                               |
| Henyard:     | Superbowl, man. I'm missing my game.[2]                   |
| Agent:       | Well, it's 6:00. You've got a couple of [sic] three hours yet. |

The officers continued the interrogation after this exchange. At around 2:30 p.m., Robert O'Connor of the Florida Department of Law Enforcement arrived and continued the interrogation. Before asking Henyard any questions, O'Connor reminded Henyard of his <u>Miranda</u> rights and asked him again whether he wanted to talk:

|            |                                                             |
|------------|-------------------------------------------------------------|
| O'Connor:  | Okay. A little while ago, some FBI agents read you your rights. Do you remember those rights? |
| Henyard:   | Uh-huh.                                                     |
| O'Connor:  | Do you remember signing this piece of paper that says Waiver of Rights, right where it says there? |
| Henyard:   | Yes, sir.                                                   |
| O'Connor:  | Okay. How old are you, Richard?                            |
| Henyard:   | Eighteen.                                                   |
| O'Connor:  | Eighteen? How far did you go in school?                    |
| Henyard:   | Eleventh grade.                                             |

---

[2]The interrogation occurred on the day of the Super Bowl.

O'Connor:   Can you read and write the English language?
Henyard:    Yes, sir.
O'Connor:   You understand what we're talking about here today?
Henyard:    Yes, sir.
O'Connor:   You've been talking to some other people here earlier today and they've been talking to you about a very serious situation. Do you understand what they're talking about?
Henyard:    Yes, sir.
O'Connor:   Okay. There's no question in your mind what we're talking about here today?
Henyard:    No.
O'Connor:   About a killing?
Henyard:    Huh-uh.
O'Connor:   Okay. As long as we all know where we're coming from before we get started here today, okay?
Henyard:    (Inaudible).
O'Connor:   All right. I want you to go ahead and tell me – You did say you understood all these, right?
Henyard:    Uh-huh.
O'Connor:   All these rights? I'm not going to read them again to you because you've already been read them, okay?
Henyard:    Uh-huh.
O'Connor:   They've been read to you, you understand them. They were read to you at 1:33 p.m., and it's now 2:35. They were – just about an hour ago they were read to you, okay?
Henyard:    Uh-huh.
O'Connor:   Do you still have – do you still want to talk to us?
Henyard:    Yes, sir.
O'Connor:   Okay, great . . . .

Following this exchange, O'Connor continued interrogating Henyard.

At some point in the ongoing interrogation, Officer Hart noticed blood on

12

Henyard's shoes and socks. Officer Hart confronted Henyard about the blood, and Henyard immediately recounted a different story of what had transpired the previous night, saying, "I'm being straight up this time."

Henyard began by telling the officers that he and Smalls had gone to Winn Dixie and had carjacked Dorothy Lewis at gunpoint. Henyard admitted that he and Smalls then had driven down a dirt road and parked Lewis's car at the side of the road. Henyard asserted that Smalls told Dorothy Lewis to exit the car and sit on the trunk, where Smalls raped her while her children and Henyard sat in the back seat. Henyard admitted that he then joined Smalls behind the vehicle, intending to rape Lewis as well. Henyard stated that when he started to have sex with Lewis, she grabbed at the gun, which was sitting on the trunk of the car.

Henyard claimed that while struggling with Dorothy Lewis for the gun, he inadvertently shot her in the leg. Henyard eventually admitted, however, that he shot Dorothy Lewis at least two more times in the face and left her at the side of the road. Henyard explained that he and Smalls got back in the car and drove further down the road with the Lewis children still in the back seat, crying for their mother.

Henyard insisted that Smalls then took the children out of the back seat and shot them each in the head, while Henyard remained in the car. However, Henyard

13

eventually acknowledged that he helped Smalls carry the bodies of the two Lewis children a short ways from the road, where he and Smalls discarded the bodies behind a barbed wire fence.

Prior to trial, Henyard moved to preclude from trial all statements he made to law enforcement officers on January 31, 1993. Henyard contended that he had not knowingly and voluntarily waived his Miranda rights, and that to whatever extent he had consented to the interrogation, he subsequently revoked his consent and questioning should have ceased.

On May 11, 1994, the state trial court held a lengthy hearing concerning Henyard's motion to suppress. The trial court heard from numerous witnesses, including Donaldson, Neal, Perry, and at least four of the officers involved in questioning Henyard. In considering the motion to suppress, the trial judge also read the transcript of Henyard's interrogation multiple times and watched the videotaped portion of Henyard's statements.

The state trial court precluded all of Henyard's statements made between pages 4 and 32 of the transcript – from when the officers suggested Henyard might be guilty of accessory after the fact to when Henyard waived his rights and consented to talk. During this pre-Miranda portion of the interview, Henyard denied participating in the carjacking, rape, attempted murder and murders. The

14

suppression issue on appeal thus involves only Henyard's contention that the trial court also should have precluded Henyard's confessions after he received the Miranda warnings and waived his Miranda rights. The state trial court concluded that these statements were admissible because Henyard made them after knowingly and voluntarily waiving his Miranda rights.

In support of its conclusion that Henyard understood his rights, the state trial court cited in particular that: (1) Henyard understands the English language well; (2) Henyard was advised of his rights multiple times, and in each case waived them, at least once in writing; (3) Henyard has an eleventh grade education; (4) Henyard's I.Q. of eighty-five is not substantially below average; and (5) Henyard had been advised of his rights on previous occasions. The state trial court also found that Henyard's statements were given voluntarily, citing in particular that: (1) the record showed no evidence that Henyard confessed under duress, threats, or false promises; (2) after consenting to be questioned, Henyard never revoked that consent; and (3) the record demonstrated Henyard's capacity for abstract reasoning, as shown by the fact that Henyard was aware that his actions carried serious consequences and that he initially lied as to what had transpired.

## B. Jury Selection

On February 3, 1994, Henyard moved for a change of venue, arguing that

extensive pretrial publicity had prejudiced the jury pool and made it impossible for Henyard to receive a fair trial in Lake County, Florida. See Fla. R. Crim. P. 3.240 (allowing for change of venue "on the ground that a fair and impartial trial cannot be had in the county where the case is pending"). Henyard attached to his motion an appendix including dozens of newspaper articles from the Orlando Sentinel and the Leesburg Daily Commercial.[3] The state trial court heard argument on the motion at a pretrial hearing on February 23, 1994, and denied the motion.

The jury selection process was extensive. Prior to trial, the parties conferred and agreed upon a questionnaire to be sent to prospective jurors. The questionnaire focused on two issues in particular: the prospective jurors' prior knowledge of the case and the prospective jurors' views on the death penalty. The state trial court dismissed some prospective jurors based on the questionnaires, either because of their positions on the death penalty or their prior knowledge of the case, or because they provided valid excuses.

Those prospective jurors who were not dismissed based on the questionnaire or who did not answer the questionnaire were summoned. During the lengthy voir dire, each prospective juror was asked individually about his knowledge of the case

---

[3] The Daily Commercial is a local newspaper serving Lake and Sumter Counties. The Orlando Sentinel is the larger Orlando newspaper, serving seven counties, including Lake County.

and his ability to judge the case impartially.[4]  The eventual jurors had at most a basic knowledge of the crime and virtually no knowledge of the investigation, the arrest of Henyard, or the evidence against him.  Each of the eventual jurors testified to having no prior opinion on Henyard's guilt, and all stated that they could be fair and impartial.

After voir dire was finished, Henyard renewed his motion for change of venue based on pretrial publicity.  Henyard noted that he had submitted to the court yet additional examples of media coverage of the case in the run-up to trial.  The trial court denied the renewed motion.

## C.    Guilt Phase

At trial, the government presented overwhelming evidence of Henyard's guilt, including the video of Henyard's confession to carjacking the Lewises, raping and shooting Dorothy Lewis, and discarding the bodies of Jasmine and Jamilya Lewis.  Among the many witnesses was Dorothy Lewis herself, who testified that Henyard carjacked her and her children, raped her on the trunk of her car while her children sat in the back seat, and shot her in the leg and face.  Forensic evidence established that Henyard shot Dorothy Lewis with the gun he stole from Luther Reed and that the same gun was used in the murders of Jasmine

---

[4]The transcript of the voir dire extends over 1,000 pages.

17

and Jamilya Lewis. The government also introduced expert blood spatter

testimony. That testimony established that the blood on Henyard's clothing

indicated he was within four feet of Jasmine and Jamilya Lewis at the time they

were executed, whereas the blood on Smalls's clothing was consistent not with the

spatter from a gunshot wound, but rather with blood stains from moving a bloody

body. After deliberation, the jury found Henyard guilty of all charges, including

the capital murder of Jasmine and Jamilya Lewis.

**D.     Penalty Phase**

Because Henyard asserts that his counsel was ineffective during the penalty

phase of his trial, we review that phase in detail.

**1.     Aggravating Evidence**

The government put on three witnesses during the penalty phase of the trial

to augment the guilt-phase evidence of aggravating circumstances justifying a

sentence of death. First, Dorothy Lewis augmented her testimony by reciting a

specific incident during the crime. Lewis testified that while she was in the back

seat of the car with her two daughters, she began to pray audibly to Jesus. When

Henyard heard her praying to Jesus, Henyard turned to her and said, "You might as

well stop calling Jesus, this isn't Jesus, this is Satan." This testimony supported

the government's contention that Henyard terrorized his victims and that the crime

18

was especially heinous, atrocious and cruel.

Carol Custar, a court clerk for the Juvenile Division of the courthouse, testified to verify the court's record of Henyard's juvenile conviction, and thus the presence of the aggravating factor of a past conviction for a violent felony. The government then introduced into evidence the authenticated record of Henyard's 1989 charge and guilty plea to robbery with a weapon. At the time of that crime, Henyard was 14 years old.

Finally, the government called Leroy Parker, the same expert in blood spatter analysis who had testified at trial. Parker was called to refute any claim by Henyard that his role in the murders of Jamilya and Jasmine Lewis was minor. Parker testified that he examined Henyard's and Smalls' clothing and found high velocity blood spatter on only Henyard's clothing. This blood evidence suggested that Henyard was within four feet of Jasmine and Jamilya Lewis at the time they were shot in the head.

### 2. Mitigating Evidence

Henyard called eight witnesses on his behalf during the penalty phase.

Jeff Pfister, an attorney, testified by deposition that he represented Henyard in Henyard's 1989 juvenile case for robbery with a weapon. According to Pfister, Henyard and two friends had robbed a convenience store of roughly $70. Henyard

acted only as a lookout, but because one of Henyard's accomplices wielded a stick, Henyard was charged with robbery with a weapon. Pfister acknowledged that the adult equivalent charge for Henyard's conduct would have been armed robbery.

Henyard next called Michael Graves, an attorney and criminal justice expert. Graves testified about the Florida Sentencing Guidelines. Graves testified that if Henyard were sentenced to consecutive life sentences rather than death, Henyard would effectively have no hope of ever being released or paroled.

Nyoka Wiley, Henyard's Godsister, testified on his behalf. Wiley explained that she had grown up in the same house with Henyard in Eustis, Florida, until Henyard was eleven, and that both were raised by Wiley's mother and Henyard's Godmother, Jacqueline Turner. Wiley explained that Turner took good care of Henyard, took him to church, and taught him right from wrong. Wiley told the jury that Henyard always gave Turner "the utmost respect, . . . just like she was his mother." Wiley stated that she and Henyard were very close, and that she loved him despite what he had done.

Wiley noted that Henyard "never really spent time" with his biological mother, Hattie Gamble. Wiley also testified that most of Henyard's friends when he was growing up were younger than he, and that he had resisted going to ninth grade because he wanted to remain with his younger friends.

20

Edna McClendon, a former teacher of Henyard, was called. McClendon testified that during Henyard's ninth grade year, his school was unable to register him because no parent would come to register him. McClendon never saw Henyard's mother, and Henyard told her that his mother was dead. McClendon remarked that Henyard never had disciplinary problems in school.

The fifth mitigating witness was Henyard's biological father, Richard Henyard, Senior ("Senior"). Senior testified that he had held a steady job as a truck driver for twenty-eight consecutive years, since before Henyard was born. Senior met Hattie Gamble, Henyard's biological mother, in 1973, and lived with her only briefly in Eustis, Florida. Senior subsequently moved from Eustis to Pahokee, Florida, and his job as a truck driver required that he travel frequently. However, Senior stated that he would visit Henyard "[a]s often as I could, every chance I got." Senior acknowledged having "lost contact" with Henyard when Henyard was seven or eight. Senior also acknowledged that before that time, Henyard spent the night at Senior's house on only one occasion, for two or three weeks.

Senior did not see Henyard again until he was eleven, when Senior tracked Henyard to Jacqueline Turner's home in Eustis. Senior stated that when he found Henyard, Henyard looked "[d]irty, nasty" and was not dressed appropriately.

Senior decided to take Henyard from Turner, and brought Henyard into his home in Pahokee, Florida, with Edith Ewing, Senior's common law wife. Aside from a brief period when Henyard returned to live with Turner, Henyard lived with Senior and Ewing until he was seventeen. However, Senior's heavy workload made it difficult for him to have a one-on-one relationship with his son. For instance, Senior was never involved in Henyard's education in any way, never met Henyard's friends or teachers, and never took him to ball games or other social activities. Senior had no history of drug use or alcohol abuse.

Jacqueline Turner, Henyard's Godmother, was Henyard's sixth witness. Turner testified that she had been friends with Henyard's biological mother, Hattie Gamble, since both were fourteen. Turner related that Gamble had drug and alcohol problems before she became pregnant with Henyard, but that Gamble did not use substances during the pregnancy.[5] Turner also stated that Gamble had a difficult time giving birth to Henyard. After Henyard's birth, Gamble began drinking heavily again, to the point that she was drunk every day. When Turner found Gamble naked, drunk, and having sex with multiple men, she decided to take Henyard from Gamble. Henyard was ten months old at the time. Turner cared for

---

[5]As Dr. Toomer later testified, there is no evidence that Henyard suffered from fetal alcohol syndrome. However, Gamble herself acknowledged abusing substances during her pregnancy.

him exclusively until he was three. Between the ages of three and eleven, Henyard continued to stay with Turner but returned periodically to stay with his mother.

Turner testified that other children would ridicule Henyard, teasing that his mother was a lesbian. Even so, Henyard often wanted to be with his mother, in part because Turner disciplined him while his mother did not. When Henyard stayed with Turner, Turner imposed rules on him, took him to church, and treated him like one of her own. Turner acknowledged that by the time Henyard turned eleven, he was becoming too much for her to control, he stayed out late at night, and he frequently skipped school.

Henyard's seventh mitigation witness was Dr. Jethro Toomer, an expert in psychology and forensic psychology. Dr. Toomer met with Henyard in prison on two occasions, in February 1993 and October 1993. Dr. Toomer administered several machine-scored psychological tests and other, subjective psychological tests to assess Henyard's intelligence and personality. Dr. Toomer also interviewed Jacqueline Turner and Hattie Gamble by phone, and reviewed the transcripts of Henyard's confessions to police and other records from the case.[6]

Based on the series of tests he administered, Dr. Toomer testified that Henyard had an I.Q. of 85, placing him in the twenty-fifth percentile, a level which

---

[6]Dr. Toomer never spoke with Henyard's father because Dr. Toomer "was not aware that he was involved in his son's life."

Dr. Toomer described as "low average."[7] Dr. Toomer assessed that Henyard had certain deficiencies in visual motor coordination and perception and showed patterns of insecurity and impulsivity. According to the test results, Henyard also placed in approximately the ninetieth percentile on scales measuring his likelihood for susceptibility to substance abuse and thought disturbance. Henyard showed extremely low self esteem, and the tests indicated to Dr. Toomer that Henyard had impaired emotional responses and a chronic inability to handle stress and responsibility. Dr. Toomer also noted that Henyard had faced learning disabilities and irregular attendance at school, and eventually had dropped out in the ninth or tenth grade. Dr. Toomer testified that Henyard had "blunted affect," meaning a low level of emotionality with a mood that "tends to be very flat and very sober."

Dr. Toomer also acknowledged, however, that Henyard did not show psychosis and that "there was nothing to indicate any severe psychopathology in terms of [Henyard's] functioning." Dr. Toomer stated that he found no evidence that Henyard had suffered from fetal alcohol syndrome. Dr. Toomer also verified on cross-examination that while he believed Henyard had an impaired capacity for

---

[7]On cross-examination, Dr. Toomer acknowledged that Henyard had taken a scholastic achievement test in school and obtained a "skill achieved" rating in all but three of a number of areas of reading and writing proficiency. Dr. Toomer admitted that these test results were "incompatible" with his assessment of Henyard's I.Q., but asserted that the school test was "not really that sophisticated" and asserted that these school results should be discounted.

appreciating the criminality of his conduct, that impairment was not substantial and did not rise to the level of being a statutory mitigating factor.

Based on the test results and his observations, Dr. Toomer gave his opinion that Henyard was functioning at the intellectual, emotional and mental level of a thirteen-year-old. Dr. Toomer attributed many of Henyard's deficiencies to the fact that, in Dr. Toomer's estimation, Henyard was raised "with an absence of nurturing." Dr. Toomer particularly emphasized that Henyard had moved from a stable to a non-stable environment on multiple occasions, and that his father had been mostly absent until he turned eleven. Dr. Toomer concluded that Henyard was unable to foresee consequences with the same capacity as a normal eighteen- or nineteen-year-old, and that he was under "some emotional disturbance" at the time of the murders. However, Dr. Toomer acknowledged on cross-examination that at the time of the crimes Henyard concretely knew that it is wrong to kill someone.

Finally, Henyard called his biological mother, Hattie Mae Gamble, to testify. Gamble testified that she drank constantly at the time she was pregnant with Henyard and continued to drink heavily after he was born. Gamble also began abusing cocaine and marijuana by the time Henyard was eight. Gamble recounted that due to her substance abuse, she often lost track of Henyard even when he was

25

an infant, when he would sometimes leave the house without her noticing. Gamble acknowledged that she had been arrested ten or eleven times for shoplifting. Gamble also testified that before Henyard moved to live with his father, Senior came around only once or twice a year, and she had no contact with him. Finally, Gamble emphasized that Henyard lived for the majority of his early childhood with Turner and that Turner took good care of him.

### 3. Government's Rebuttal

The government called three witnesses to rebut Henyard's mitigating evidence. First, the government recalled Dr. Toomer. The government highlighted a number of Henyard's answers on the tests Dr. Toomer had administered. Dr. Toomer acknowledged that in his test responses, Henyard had stated that both his father and mother were good people and that he loved them both; that he had not gotten "a raw deal in life;" and that his life was "as pleasant as that of most people I know." Dr. Toomer acknowledged a series of other answers by Henyard that indicated his feelings that his family was neither unloving nor unsupportive.[8] Dr. Toomer also acknowledged that the tests he administered were machine scored and

---

[8]In particular, Henyard answered (1) "false" to the statement, "There is very little love and companionship in my family as compared to other homes"; (2) "true" to the statement, "When I feel really bad, I know I can count on my family to help"; (3) "true" to the statement, "The members of my family and my relatives get along well"; (4) "false" to the statement, "I hate my whole family"; and (5) "false" to the statement, "I have little to do with my relatives now."

that the test designers themselves cautioned against drawing any firm conclusions based upon the test results.

The government next recalled Jacqueline Turner. Turner confirmed that when Henyard was young, he frequently had moved between her house and Gamble's, which were within walking distance. Turner testified that for the majority of the time, Henyard lived with her, and that when Henyard stayed with his biological mother, it was because Henyard wanted to do so.

Finally, the government called Edith Ewing, Senior's common law wife. Ewing testified that Henyard had lived with her since he was eleven. Ewing asserted that she loved Henyard and had treated him as one of her own children. Ewing stated that she provided Henyard with a loving home with rules and guidance, but that Henyard did not always obey her rules and instructions. Ewing acknowledged that Henyard's father was infrequently home because of his long work hours.

### 4. Closing Arguments

At closing, the government began by disputing the presence of significant mitigating factors. The government acknowledged that Henyard was only eighteen at the time of the crime. However, the government argued that: (1) Henyard's efforts to lie to the police and his demeanor during his recorded statement indicated

27

his understanding of the wrongfulness of his actions as well as his relative intelligence; (2) although Henyard's biological parents were not always present, Henyard was raised in loving, relatively stable environments by Turner and Ewing; (3) there was no evidence that Henyard was under the substantial influence of drugs or alcohol at the time of the crime; (4) the evidence overwhelmingly pointed to Henyard as the planner and leader of the crimes and the shooter of the two children, Jamilya and Jasmine; and (5) Dr. Toomer's conclusions that Henyard was emotionally disturbed and incapable of abstract reasoning were not credible in light of his reliance on machine-scored tests and his dismissal of other trial evidence of Henyard's capacities.

The government then argued for four aggravating factors: (1) Henyard had committed the crimes in part for pecuniary gain, i.e. to steal Ms. Lewis's car; (2) Henyard killed the two children, Jamilya and Jasmine, to avoid arrest and eliminate witnesses to his other crimes that night; (3) Henyard had multiple prior felony convictions, in particular his 1989 robbery conviction and the additional counts charged with the Lewis murders; and (4) Henyard's crime terrorized the Lewises and was particularly heinous, atrocious or cruel.

In closing, Henyard first addressed the aggravating factors mentioned by the government, arguing: (1) there was no evidence that the capital offenses – the

28

murders of Jamilya and Jasmine – were committed for pecuniary gain; (2) there was no evidence that Henyard murdered Jamilya and Jasmine to silence witnesses; (3) Henyard's only true "prior" conviction was for his minor role in a minor robbery; and (4) although all murders are heinous, Jamilya and Jasmine were killed instantly and without special pain.

Henyard then focused on mitigating factors, including: (1) Henyard was eighteen at the time of the crime; (2) Henyard was mentally and emotionally young even for that age, as evidenced by his preference for younger friends and for being held back in school; (3) Henyard's judgment at the time of the crime was impaired by drugs and/or alcohol; (4) Henyard lacked a nurturing childhood because his mother was a substance abuser and his father was mostly absent from his life; (5) Henyard behaved well in school; (6) Henyard would be sentenced to six life sentences if a death penalty were not imposed; and (7) the evidence indicated that Smalls was the one who shot Jamilya and Jasmine. Henyard suggested that the jury recommend sentences of life imprisonment.

**5.    Sentence**

After deliberation, the jury unanimously recommended that Henyard be sentenced to death. The state trial court held a sentencing hearing on August 19, 1994, and announced its factual and legal findings.

29

The state trial court's findings of fact recounted in detail the facts of Henyard's crime. The trial court then noted that: (1) after the crime, "only after intense questioning, [Henyard] begrudgingly confessed his involvement in these murders"; (2) Henyard was convicted of two capital felonies and six non-capital felonies involving violence; and (3) because codefendant Smalls was under sixteen years of age at the time of the crime, he would not be eligible for the death penalty.

The state trial court then made lengthy findings of law. The trial court found the following aggravating factors: (1) Henyard had been convicted of prior violent felonies, specifically a second capital felony and six non-capital felonies involving violence, including his 1989 juvenile conviction, see Fla. Stat. 921.141(5)(b); (2) Henyard had murdered Jamilya and Jasmine Lewis during the course of kidnaping them, see Fla. Stat. 921.141(5)(d); (3) Henyard committed the murders for pecuniary gain, see Fla. Stat. 921.141(5)(f); and (4) the murders were especially heinous, atrocious or cruel, see Fla. Stat. 921.141(5)(h).

The state trial court found one specific statutory mitigating factor: the fact that Henyard was only eighteen at the time of the crimes. See Fla. Stat. 921.141(6)(g). The trial court also noted the fact that codefendant Smalls was not death eligible, and that disparity in punishment between codefendants is a non-statutory mitigating factor. The trial court then discussed in detail each of the

30

twenty-three mitigating factors argued by Henyard's counsel both to the jury and

to the court.[9]

The state trial court considered together Henyard's first six mitigating

factors (A-F), which all related to Henyard's intellectual and emotional immaturity

and his impaired reasoning and impulse control. The trial court noted that all these

factors were based on the testimony of Dr. Toomer, which the court found not

credible. The trial court noted that (1) Dr. Toomer had based his assessment of

Henyard in part on Henyard's "self-serving, uncorroborated, lie-filled,

contradictory statement" to police; (2) Dr. Toomer based many of his conclusions

---

[9]The twenty-three mitigating factors were that: (A) at the time of the offense, Henyard functioned emotionally as a thirteen-year-old; (B) Henyard has low intelligence; (C) his low intelligence led to his placement in special education classes; (D) Henyard has poor impulse control; (E) Henyard has difficulty reasoning abstractly; (F) Henyard has difficulty foreseeing the consequences of his actions; (G)-(H) at the time of the crime, Henyard had been using drugs and alcohol, impairing his judgment; (I)-(J) Henyard's mother used alcohol and marijuana while she was pregnant with him; (K) Henyard was born with a skin disorder and was shunned as an infant; (L) Henyard lacked a father figure; (M) Henyard's mother was a poor role model; (N) Henyard had little or no nurturing from his mother and very little contact with his father during his formative years; (O) Henyard's mother abused alcohol and drugs throughout Henyard's life; (P) Henyard's limited contact with his mother after moving in with his father taught Henyard that no one cared for him; (Q) Henyard had an impoverished upbringing; (R) Henyard was raised in a grossly dysfunctional family with no stable living environment; (S) Henyard was respectful and behaved well when he was in a stable, structured environment; (T) Henyard cooperated with investigators; (U) Henyard could adequately adjust to prison life; (V) Henyard would never be released from prison even if not sentenced to death; and (W) no evidence established that Henyard was the shooter of the Lewis children.

Although the state trial court characterized these as non-statutory mitigating factors, some of them arguably reflect upon statutory mitigating factors, in particular Fla. Stat. 921.141(6)(b) ("The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.") and Fla. Stat. 921.141(6)(f) ("The capacity of the defendant to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired.").

31

on machine-scored psychological exams, but failed to take into consideration the fact that the exams themselves warned not to draw conclusions from the tests and that the results may be invalid; and (3) Dr. Toomer had made assertions at Henyard's suppression hearing that lacked credibility in the eyes of the court. The trial court also found incredible Dr. Toomer's claims during the suppression hearing that "when [Henyard] repeatedly stated that he understood his rights, he really did not"; that when Henyard "asked for his auntie, [he] was really asking for an attorney"; and that when Henyard lied to the police, "he was doing this not because he appreciated the criminality of his conduct, but because he was being harassed." The trial court therefore gave "little consideration" to the factors related to Henyard's low intelligence, emotional immaturity and poor impulse control.

The trial court found no evidence that Henyard was a substance abuser and little evidence that he had committed the crimes while under the influence of drugs or alcohol, and thus gave "very little weight" to these mitigating factors (G-H).

The trial court gave no weight to the facts Henyard cited with respect to his birth and infancy, finding that there was no evidence that these circumstances had any impact on him. (I-K).

The trial court disputed factor (L), Henyard's purported lack of a father figure. Rather, the court found that Henyard did have a father figure who cared

32

deeply for him, worked seventy to eighty hours a week, did not abuse substances or break the law, and cared for his family.

The trial court also found factor (M), that his mother was a poor role model, unproven. The trial court acknowledged that Henyard had little nurturing from his mother during his formative years (N) but noted that both Turner and Ewing loved Henyard and provided him with motherly support and stable homes. The trial court gave this factor "some consideration." The trial court gave little weight to the fact that Henyard's mother had abused alcohol and drugs (O), stating that this was not a mitigating factor under the circumstances of this case. The trial court found no evidence that Henyard's lack of contact with his mother taught him that no one cared about him (P).

The trial court found that Henyard had proven that he had an impoverished upbringing (Q), but the court gave this fact little weight. The trial court agreed that Henyard was born into a dysfunctional family (R), but gave only slight weight to this factor in light of the stable, caring environment provided by Jacqueline Turner. The trial court found no evidence that Henyard was well-behaved during times when he was in a stable, structured environment (S).

The trial court found that though Henyard admitted his involvement in the crimes, he did so only after lying and while under police pressure. Thus, the trial

33

court denied mitigating factor (T).  The trial court gave "very, very little weight" to the evidence concerning whether Henyard would be able to adjust to prison life (U).  The trial court acknowledged that Henyard would be imprisoned for life if he were not sentenced to death, but gave this factor (V) "little weight."

Lastly, the trial court rejected Henyard's assertion that he had not fired the shots that killed Jamilya and Jasmine (W).  The trial court stated that the evidence at trial "strongly indicates that the defendant fired the fatal bullets which killed Jamilya and Jasmine Lewis, and this Court hereby so finds."

Finding that "the aggravating factors legally outweigh the mitigating factors," and considering the jury's recommended sentence, the trial court sentenced Henyard to death on each of the murders of Jamilya and Jasmine Lewis.

## II.  POST-CONVICTION HISTORY

### A.    Direct Appeal

Henyard timely appealed his conviction and death sentence, raising eleven assignments of error.  In relevant part, Henyard argued that (1) his statements to the police were improperly admitted; and (2) the trial court erred by denying his motion to change venue.  On December 19, 1996, the Supreme Court of Florida denied Henyard's appeal.  Henyard v. State, 689 So.2d 239 (Fla. 1996).

After reviewing Henyard's confession, the Florida Supreme Court found that

34

during the duration of his police interrogation, Henyard had not made even an equivocal request to cease questioning. Id. at 247. Even assuming arguendo that Henyard had requested to cease questioning, the Florida Supreme Court held that the admission of Henyard's statements represented harmless error in light of the overwhelming evidence against him. Id. at 248.

With respect to Henyard's venue argument, the Florida Supreme Court reviewed the trial record and concluded that "[d]uring the actual voir dire here, each prospective juror was questioned thoroughly and individually about his or her exposure to the pretrial publicity surrounding the case." Id. at 245-46. The Florida Supreme Court emphasized that "[w]hile the jurors had all read or heard something about the case, each stated that he or she had not formed an opinion and would consider only the evidence presented during the trial in making a decision." Id. at 246. The Florida Supreme Court concluded that "the record demonstrates that the members of Henyard's venire did not possess such prejudice or extensive knowledge of the case as to require a change of venue," and that therefore "the trial court did not abuse its discretion in denying Henyard's motions for a change of venue." Id.

B.    State 3.850 Proceedings

Pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure, on

August 5, 1998, Henyard filed in the Circuit Court of Lake County, Florida, a motion to vacate his conviction and sentence (the "3.850 motion"). Henyard's 3.850 motion raised nine claims, including a claim of ineffective assistance of counsel during the penalty phase of his trial. On October 14, 1999, the state 3.850 court held an evidentiary hearing.

### 1. Henyard's 3.850 Witnesses

Henyard called seven witnesses in support of his claim of ineffective assistance of counsel. Henyard's first two witnesses, Rosa Lee Adams and Lula Bell Davis, were neighbors of Henyard's who had observed Henyard growing up. Adams and Davis testified that Henyard's mother abused drugs and alcohol, was promiscuous and was minimally involved in caring for Henyard. Both witnesses averred that Henyard effectively was raised by many people in the neighborhood and often went from home to home. On cross-examination, Adams acknowledged that on the day of the murders, Henyard had a gun in his possession while at Adams's house. Neither witness had been contacted by Henyard's trial counsel prior to his sentencing.

Henyard next called Jacqueline Turner. Turner's testimony was entirely consistent with her testimony during sentencing at trial, but she added certain details to which she had not testified at trial. These details included: (1) Gamble

36

was promiscuous; (2) Henyard had tried to set fire to Turner's house on two occasions when he was seven; (3) while Henyard lived with his father, his father would periodically put him out of the house; (4) Henyard threw "a temper tantrum" when Turner tried to register him for the ninth grade because he wanted to stay in middle school; (5) Henyard frequently skipped school, despite Turner's efforts to keep him there; was difficult to control; stole from Turner; and committed other thefts and crimes; and (6) when Turner visited Henyard in jail prior to trial, Henyard broke down crying and related that as a child a man named Bruce Kyle had raped him. Turner admitted that the first time Henyard told her that Kyle raped him was while he was in jail awaiting trial. Turner testified that she told Henyard's counsel, Michael Johnson, about Henyard's report of sexual abuse.

Henyard next called Angelette Wiley, Turner's daughter, who knew Henyard "all his life" and considered him like a younger brother. Wiley testified that: (1) Henyard's mother had frequent affairs with both men and women when Henyard was growing up; (2) neighborhood children would pick on Henyard and beat him up because of his mother's behavior; (3) Henyard was in the choir at church at some point as a child; (4) Turner took good care of Henyard and treated him as one of her own; and (5) Henyard had told Wiley that he was molested and raped by Bruce Kyle when he was about seven.

37

Wiley stated that Henyard's trial counsel never talked to her and she never conveyed any information to Henyard's lawyers prior to trial. Wiley was inconsistent as to whether Henyard's trial counsel tried to contact her. At first, Wiley acknowledged that before the trial, Henyard's counsel had left messages for her with Turner and that she had made little effort to return the messages. Wiley tried to retract this testimony later, stating that she had never been aware of any efforts by Henyard's counsel to contact her.

Henyard's fifth witness was Dr. Russell Bowers, an expert in neuropsychology and clinical psychology. Dr. Bowers had conducted a neuropsychological evaluation and clinical interview of Henyard five years after the trial. Dr. Bowers related what Henyard had told him about his upbringing, including his mother's problems and his moving between households. Dr. Bowers also mentioned that Henyard had asserted that (1) Henyard was hyperactive and was placed in emotionally handicapped classes in the first grade; (2) Henyard never got along with Ewing, his father's common law wife, and began stealing because she treated him poorly; and (3) he began using marijuana and alcohol when he was eleven, although he was never seriously intoxicated. Dr. Bowers gave no indication that Henyard had reported any history of sexual abuse.

Dr. Bowers also administered psychological tests. The test results and Dr.

Bowers's interaction with Henyard led Dr. Bowers to conclude that (1) Henyard's intelligence was "low average to average"; (2) Henyard showed mild slowing in one test of attention, but also performed normally on other tests, including tests for abstract thinking and motor skills; and (3) Henyard showed no evidence of excessive cognitive impairment that might be indicative of fetal alcohol syndrome, and the tests did not support such a diagnosis.

Henyard's sixth witness was Katherine Ann McCoy, who was roughly Henyard's age and grew up across the street from Henyard's mother's home. McCoy testified that her mother would not allow her to go over to Henyard's mother's place because Henyard's mother dated women. McCoy acknowledged that she did not know what Henyard's home life had been like and denied that Henyard suffered teasing or harassment at the hands of other neighborhood children.

Finally, Henyard called Trena Lenon, who considered herself Henyard's sister. Lenon moved into Jacquelyn Turner's home in Eustis, Florida, when she and Henyard were about fourteen years old. Lenon stated that Henyard told her that when Henyard stayed with his father and Ewing in Pahokee, Florida, Ewing and Henyard did not get along, and that Ewing beat him and cussed at him. Lenon, however, never observed those interactions directly. Lenon also testified that

while Henyard was in jail awaiting trial, Henyard had told her during a phone conversation that he had been sexually abused as a child by Bruce Kyle.

Lenon stated that Henyard's trial counsel had never spoken to her before he was tried and sentenced. However, Lenon also stated that she was living in Saint Petersburg at a women's residence for about four months at the time that Henyard was tried and sentenced.

## 2. Government's 3.850 Witnesses

The government called six witnesses. The government's first witnesses were Henyard's father, Senior, and Senior's common law wife, Ewing. Senior testified that to his knowledge, Ewing had never spanked, beaten, or thrown anything at Henyard. Ewing testified that she had spanked Henyard once or twice with a belt, but otherwise had not beaten him or thrown anything at him. Ewing explained that she had punished Henyard because he had stolen from her multiple times, including stealing a VCR and a gun. Ewing testified that she loved Henyard.

The government's next three witnesses were all involved in Henyard's defense at trial: Henyard's lead trial counsel, Thomas Michael Johnson, co-counsel Mark Nacke,[10] and investigator J.T. Williams. Johnson testified that he had been a

_____

[10]Bill Stone also acted as co-counsel and participated in the collection of mitigation evidence. Stone did not testify at the hearing.

public defender for nearly his entire career between 1981 and 1995, at which point Johnson became a circuit judge. At the time of Henyard's trial, Johnson had previously tried five capital cases and perhaps 60 to 80 major felony cases.

Johnson and the other witnesses recounted the investigation they did on Henyard's case. Johnson and the defense team met with Henyard in jail on many occasions, asking him to identify any individuals who were significant or even insignificant in his life in order to develop a mitigation case. Johnson met with Henyard's mother and Turner on many occasions, as well as with numerous family members. Johnson went to Pahokee, met with Ewing and Henyard's father, and met with all of Henyard's school teachers. Johnson retained two psychiatrists, Dr. Toomer[11] and Dr. Elizabeth McMann,[12] to evaluate Henyard. Johnson reviewed Henyard's school and medical records.

Other investigators assisted Johnson in meeting yet more potential witnesses. Johnson's notes, for example, indicate that Steve Bevill (an investigator who did not testify at the hearing) visited Pahokee, Florida, and met with Ewing, with Henyard's grandmother, with Ewing's next-door neighbor, and with multiple

---

[11]Johnson recounted that he prepared Dr. Toomer by providing him with depositions of Gamble and Turner, with Henyard's recorded interrogation with police, and with other trial documents. He also consulted Dr. Toomer on a number of occasions.

[12]Dr. McMann did not testify at sentencing. Johnson testified that Dr. McMann herself stated that it would not be wise to call her as a witness because she saw insufficient evidence to support any of the three statutory mitigating circumstances that are psychological in nature.

41

officials at Henyard's school, including staff in the cafeteria. Investigator Michael Upton went to Eustis High School and the school board office to speak with witnesses and obtain records. Johnson stated that it was difficult to track down many people, but that he and the defense team made a concerted, good faith effort to find everyone Henyard and others mentioned as possibly possessing mitigating evidence.

Johnson explained one of his tactical decisions during the penalty phase. Johnson explained that he decided not to introduce evidence that Henyard and Ewing did not get along, because Ewing regarded Henyard as a "little thief" and Johnson did not want to open the door to introduction of that evidence.

Johnson did not remember Henyard telling him about being sexually abused. Johnson acknowledged that in his trial notes, Johnson had recorded that Henyard had told the defense that Bruce Kyle sexually abused him when he was eight or nine. However, Johnson also affirmed that his case file included the notes of a jailhouse doctor who evaluated Henyard prior to trial, and that these notes stated that Henyard had told the doctor he had no history of sexual abuse. Co-counsel Nacke and investigator Williams also could not remember any claim by Henyard that he had been sexually abused, and their notes showed no such statements by Henyard. In fact, Williams's notes indicated that, prior to trial, he had asked

42

Henyard whether he had suffered sexual abuse, and Henyard had stated that he had not been sexually abused. Because none of Henyard's team could recall ever being advised about the sexual abuse, they could not state why they did not use that evidence during the penalty phase.

Johnson did not recall whether Henyard had been placed on suicide watch when first jailed. Johnson also stated that he had never seen any reason to investigate further the possibility that Henyard suffered from fetal alcohol syndrome.[13]

Finally, the government called Dan Pincus, a registered nurse. In 1994, Pincus was the medical department supervisor at the Lake County jail, where Henyard was in custody awaiting trial. Pincus testified that he had treated Henyard at the time of his purported suicide attempt by tying the cord of his laundry bag around his neck. Pincus testified that he did not believe it was a legitimate suicide attempt because the knot was not tight and because Henyard pretended to be unconscious when he clearly was not.

### 3. 3.850 Court's Ruling

On April 11, 2002, the state 3.850 court denied Henyard's motion for post-conviction relief. The 3.850 court found, in relevant part, that: (1) although

---

[13]Defense counsel did, however, contact Henyard's birth hospital and obtain his birth records.

evidence existed that Ewing had spanked Henyard, Ewing provided him a loving and stable home, and trial counsel wisely chose not to introduce this evidence because it would have allowed the jury to hear about Henyard's frequent acts of theft; (2) the evidence that neighborhood children teased Henyard and beat him was not proof of ineffective assistance of counsel because the jury was presented with such evidence at sentencing; (3) there was no strong evidence that Henyard abused drugs or alcohol, and trial counsel made a reasonable decision not to introduce such evidence at sentencing; (4) counsel made a wise choice not to introduce evidence of Henyard's suicide attempt in jail because it appeared insincere and manipulative; (5) no evidence supported Henyard's claim that his counsel inadequately prepared Dr. Toomer to testify; and (6) no evidence supported Henyard's claim that he suffered from fetal alcohol syndrome, so his counsel's decision not to introduce such evidence was not ineffective assistance of counsel.

With respect to Henyard's argument that his trial counsel should have investigated whether he was sexually abused and should have introduced evidence of the abuse at sentencing, the 3.850 court found that (1) the evidence was inconsistent with regard to whether Henyard was sexually abused and particularly with regard to whether trial counsel had reason to know that Henyard had told

44

Turner, Lenon and Wiley that he had been sexually abused, and thus his trial counsel had not performed unreasonably; and (2) even had Henyard's counsel introduced the hearsay evidence that Henyard had suffered sexual abuse, that evidence would not have affected the jury's sentencing recommendation.

### 4. Florida Supreme Court 3.850 Ruling

Henyard timely appealed the trial court's denial of his 3.850 motion. On May 27, 2004, the Florida Supreme Court affirmed the denial of post-conviction relief. Henyard v. State, 883 So.2d 753 (Fla. 2004). With respect to Henyard's claim of ineffective assistance of counsel during the penalty phase, Henyard argued that trial counsel was deficient for failing to present evidence of (1) his difficult childhood, as described by Adams, Davis, Wiley and Turner; (2) his physical abuse by Ewing; (3) his preference for younger friends and the harassment he suffered at the hands of other children; (4) his sexual abuse by Kyle; (5) his drug and alcohol use; and (6) his suicide attempt in jail.

With respect to the first claim, the Florida Supreme Court found that while Henyard presented four new witnesses to testify to Henyard's difficult childhood, their testimony "was substantially similar to and cumulative with testimony that was actually presented during the penalty phase." Id. at 759.

Regarding the alleged abuse by Ewing, the Florida Supreme Court found

45

little evidence to suggest that Henyard suffered continual abuse by Ewing. Id. at 760-61. In any event, the Florida Supreme Court concluded that Henyard's counsel made a reasonable strategic choice not to introduce this evidence in order to prevent evidence of any thefts from being introduced. Id. at 761.

The Florida Supreme Court found Wiley's testimony regarding Henyard's mental age and his preference for younger friends cumulative with the more extensive similar testimony presented at sentencing by Turner, Nyoka Wiley, and Dr. Toomer. Id.

With respect to sexual abuse, the Florida Supreme Court initially observed that all evidence that Henyard was sexually abused came from hearsay witnesses repeating what Henyard had told them. Id. at 762. The Florida Supreme Court also noted that prior to trial, Henyard twice had denied experiencing sexual abuse, first when he was asked by Williams and later when he was interviewed by the jailhouse doctor. Id. Under these circumstances, the Florida Supreme Court found that his trial counsel had not clearly performed deficiently by failing to introduce this evidence at sentencing. Id. Alternatively, the Florida Supreme Court found that second-hand evidence of sexual abuse a decade prior to the crimes would not have affected the jury's sentencing recommendation. Id.

The Florida Supreme Court rejected Henyard's argument that his trial

counsel should have introduced evidence of his chronic use of alcohol, finding no evidence to support the allegation that Henyard did, in fact, abuse alcohol or drugs. Id. at 762-63.

Finally, the Florida Supreme Court found that trial counsel had not performed deficiently by choosing not to introduce evidence of Henyard's suicide attempt in light of the fact that the attempt might have been viewed as manipulative. Id. at 763.

## C. Federal Habeas Petition

Henyard timely filed a petition for a writ of habeas corpus in the District Court for the Middle District of Florida. See 28 U.S.C. § 2254. On August 1, 2005, the district court denied Henyard's § 2254 petition. Henyard timely appealed to this Court, and we granted a Certificate of Appealability on the three issues identified above.

## III. STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), our review of a final state habeas judgment "is greatly circumscribed and is highly deferential to the state courts." Crawford v. Head, 311 F.3d 1288, 1295 (11th Cir. 2002). First, § 2254(e)(1) instructs us to be highly deferential to state court factual determinations, stating

47

that "a determination of a factual issue made by a State court shall be presumed to be correct," and that "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Haliburton v. Sec'y for Dep't of Corr., 342 F.3d 1233, 1238 (11th Cir. 2003).

Second, for any claim adjudicated on the merits in state court, § 2254(d) allows federal habeas relief only where the state court adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Haliburton, 342 F.3d at 1238.

## IV.  HENYARD'S CONFESSION

Henyard contends that the state trial court erred in denying his motion to suppress his confession.  Henyard argues that viewed in light of the totality of the circumstances, his statements to police were involuntary.  We disagree because the evidence overwhelmingly supports the rulings by the state trial court, the Florida Supreme Court and the federal district court that Henyard's confession was voluntary and admissible.

48

The suppression-hearing testimony established that Henyard himself asked

Annie Neal to drive him to the police station. Once there, Henyard got out of the

car, entered the police station, and spoke with the police, all on his own accord.[14]

At about 1:30 p.m., the police realized that Henyard's initial assertion that he was

only a witness to the murders was a lie, and that Henyard was in fact directly

involved in them. The police immediately placed Henyard in custody, verified that

he was eighteen and that he could read and write, and read him his Miranda rights.

Henyard waived his rights both orally and in writing. Only after waiving his rights

did Henyard make the incriminating statements eventually admitted at trial.

Henyard claims that his Miranda waiver was not voluntary given the

inquiries he made to the police. As quoted above, Henyard asked how long the

interrogation would continue and requested the presence of his auntie for any

polygraph test. These inquiries, however, do not constitute even an equivocal

invocation of the right against self-incrimination. See Delap v. Dugger, 890 F.2d

285, 291-93 (11th Cir. 1989) (holding that a suspect's questions regarding how

much longer an interview will last do not constitute even an equivocal invocation

---

[14]Although Henyard claims that he was "tricked into appearing at the police station by a police informant," Brief at 26, this is a wholly inaccurate portrayal of the facts. Moreover, Henyard has previously acknowledged that his visit to the police station was voluntary. See, e.g., Petitioner's Dist. Ct. Brief, at 10 (stating that during the suppression hearing "it was established that [Henyard] voluntarily went to the Eustis Police Department on January 31, 1993").

of his Fifth Amendment rights); Moore v. Dugger, 856 F.2d 129, 134, 134 n.1 (11th Cir.1988) (finding that suspect's inquiry "[w]hen will you all let me go home?" did not constitute even an equivocal invocation of the right to terminate questioning).

In addition, the police twice gave Henyard his Miranda rights and twice told him that he did not have to answer their questions. Henyard waived his rights when the police first read them to him, at around 1:30 p.m. At around 2:35 p.m., Henyard waived his rights a second time, when Officer O'Connor reminded him of his rights and inquired again whether he wanted to waive them. It was after this second waiver of his rights that Henyard admitted to carjacking the Lewises, attempting to rape Dorothy Lewis, shooting Dorothy Lewis three times, and discarding the bodies of Jasmine and Jamilya Lewis. Henyard's brief does not draw our attention to any place in the transcript after 2:35 p.m. where Henyard expressed even an ambiguous desire to end the questioning. Rather, during this period of the interrogation in which Henyard made the incriminating statements eventually admitted at trial, he never suggested that he wanted the interrogation to end or sought the presence of an attorney.

We also reject Henyard's claim that his confession was involuntary in light of his age and immaturity. Henyard was eighteen when he confessed, but even

50

were we to analyze Henyard's confession as though he were a juvenile at the time, we still find that his confession was voluntary. The totality of the circumstances indicate that (1) the police explained Henyard's rights to him twice; (2) Henyard's intelligence, although below average, was not so low that he could not understand his rights; (3) the transcript of the interrogation and Henyard's responses to the police give no indication that he was confused or that he misunderstood the seriousness of the interrogation; (4) the police did not engage in any trickery, deception, or improper interrogation tactics; and (5) Henyard had previous experience with the justice system. See Fare v. Michael C., 442 U.S. 707, 726, 99 S. Ct. 2560, 2572 (1979); United States v. Kerr, 120 F.3d 239, 241-42 (11th Cir. 1997). Accordingly, we conclude that the Florida Supreme Court's determination that Henyard's confession was properly admitted at trial was neither "contrary to," nor "an unreasonable application" of, United States Supreme Court precedent.

## V. CHANGE OF VENUE

Henyard next argues that his right to a fair trial was violated because the jury was not impartial. "[T]he Fourteenth Amendment's due process clause . . . safeguards a defendant's Sixth Amendment right to be tried by a panel of impartial, indifferent jurors." Coleman v. Kemp, 778 F.2d 1487, 1489 (11th Cir. 1985) (quotation marks and citation omitted).

51

Specifically, Henyard claims that he should have been granted a change of venue because the jury pool in Lake County, Florida, was tainted by prejudicial pre-trial publicity. The state trial court denied Henyard's motion for change of venue, and the Florida Supreme Court affirmed. The district court denied Henyard's § 2254 petition as to his venue claim.

An examination of the over-1,000-page transcript from voir dire shows that while most of the eventually seated jurors remembered the basic details of the crime, they remembered no details about the victims, the evidence, the investigation, or Henyard and Smalls. None of the eventual jurors had reached even a tentative opinion about the case, and all expressed that they would be able to be fair and to reach a verdict based on the evidence at trial.

Henyard also fails to show that the pretrial publicity was so ubiquitous and inflammatory that prejudice must be presumed despite the lack of any bias or prejudice expressed by the eventual jurors during voir dire. We have stated that the jury pool should be presumed to be prejudiced only in the very rare case where pretrial publicity "so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community." Coleman, 778 F.2d at 1490 (quotation marks and citation omitted); see also Spivey v. Head, 207 F.3d 1263 (11th Cir. 2000). "[T]he burden placed upon the petitioner to show

that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one." Coleman, 778 F.2d at 1537. It is only where a "barrage of inflammatory publicity immediately prior to trial" inspires a "huge wave of public passion" against the defendant that the local jury pool should be presumed unable to judge the defendant impartially. Patton v. Yount, 467 U.S. 1025, 1033, 104 S. Ct. 2885, 2889 (1984) (quotation marks, citations and punctuation omitted).

Although there was substantial local news coverage of the crime and the arrests, the publicity surrounding this case was not at a level where prejudice to the entire jury pool should have been presumed, requiring a change of venue. While some of the newspaper articles in the record implicate Henyard and discuss the heinousness of his crime, most of the articles contain little more than factual summaries of the crime and investigation. The record contains no evidence of the television or radio coverage of the crime and Henyard's involvement in it. Moreover, two or three of the articles themselves are the only weak evidence in the record that any general public sentiment had arisen about the crime. For all of these reasons, the Florida Supreme Court's determination that Henyard's motion for change of venue was properly denied was neither "contrary to," nor "an unreasonable application" of, United States Supreme Court precedent.

53

## VI. INEFFECTIVE ASSISTANCE OF COUNSEL AT PENALTY PHASE

Henyard contends that trial counsel's performance during the penalty phase was unconstitutionally deficient under Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). To prevail on this claim, Henyard must show both that his counsel performed deficiently at the penalty stage of trial and that his defense was prejudiced by that deficient performance. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. Where, as here, the petitioner claims his counsel was constitutionally deficient during the penalty phase, we consider whether counsel reasonably investigated possible mitigating factors and made a reasonable effort to present mitigating evidence to the sentencing court. See Grayson v. Thompson, 257 F.3d 1194, 1225 (11th Cir. 2001).

Even where a petitioner demonstrates that his counsel's performance at sentencing was deficient, he must also show that he was prejudiced by his counsel's deficient performance. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693, 104 S. Ct. at 2067. Rather, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695, 104 S. Ct. at 2069.

54

In his ineffective assistance claim, Henyard contends that his trial counsel deficiently failed to present potentially mitigating evidence concerning Henyard's neglectful and difficult childhood. Specifically, Henyard contends that his trial counsel failed to investigate and/or present evidence of: (1) his physical abuse by Ewing; (2) his preference for younger friends; (3) the harassment he suffered from other children; (4) his chronic use of alcohol; (5) his suicidal attempt in jail; and (6) his sexual abuse by Kyle. Henyard also claims that trial counsel inadequately prepared Dr. Toomer, his mental health expert.

The state 3.850 court rejected these contentions after an evidentiary hearing. Applying the Strickland framework, the Florida Supreme Court affirmed, finding both that Henyard's counsel did not perform deficiently during the penalty phase, and that Henyard had failed to demonstrate prejudice in any event. Henyard v. State, 883 So.2d 753 (Fla. 2004). Henyard reiterated these claims in his § 2254 petition, and the district court denied relief. For several reasons, we conclude that the Florida Supreme Court's ruling was neither "contrary to," nor "an unreasonable application" of, United States Supreme Court precedent.

First, as shown at the 3.850 evidentiary hearing, Henyard's trial team of three attorneys and three investigators conducted extensive pre-trial investigation and preparation of mitigating evidence for the penalty phase of trial. To develop

Henyard's mitigation case, Henyard's defense team interviewed him on many occasions, cataloguing everyone in Henyard's life who might act as a mitigation witness. Defense counsel met with and interviewed Henyard's biological mother, Gamble, and his Godmother, Turner, on numerous occasions. Defense counsel traveled to Pahokee, Florida, also on numerous occasions, to meet with and interview Henyard's father, Senior, and Senior's common law wife, Ewing. In addition, defense counsel called and met with Henyard's "siblings" – the other children who were raised with him in Turner's and Senior's homes.

The defense team also met with and interviewed all of Henyard's school teachers, other school officials, and many of his neighbors both in Eustis, Florida, and in Pahokee, Florida. The defense team reviewed all of Henyard's school and medical records, including records from his birth. Counsel also retained two psychiatrists, Dr. Toomer and Dr. Elizabeth McMann, to evaluate Henyard for possible mitigating evidence.

Second, based on this extensive investigation, defense counsel introduced eight mitigation witnesses during the penalty phase of trial, including Gamble, Turner, Senior, and Nyoka Wiley, Henyard's Godsister. These witnesses testified extensively regarding Henyard's difficult and unstable childhood, including the facts that: (1) Gamble, his biological mother, abused alcohol and drugs during both

56

pregnancy and Henyard's early childhood, was frequently arrested, and often abandoned Henyard; (2) because of his mother's problems, Henyard was raised mostly by Turner until age eleven, but often bounced between her home and his mother's; (3) Henyard's father, Senior, was mostly uninvolved in his life until he turned eleven, when Senior took Henyard to live with him and Ewing in Pahokee; (4) while Henyard lived with his father, he had virtually no contact with Gamble, his biological mother; and (5) Henyard was teased by neighborhood children and resisted moving to the ninth grade because he preferred the company of younger children.

Third, Henyard has not shown that his counsel was ineffective or that he was prejudiced by any of the six alleged evidentiary failures outlined above. As to the alleged failure to introduce evidence of Ewing's corporal punishment, we agree with the Florida Supreme Court that this argument is meritless. Henyard v. State, 883 So.2d at 760-61. For one, the evidence showed that any physical "abuse" by Ewing was at most limited. More importantly, Henyard's trial counsel made a reasonable strategic decision not to present this evidence. See Fugate v. Head, 261 F.3d 1206, 1223-24 (11th Cir. 2001) (stating that strategic decisions by counsel cannot be the basis for ineffective assistance of counsel claims). Namely, counsel was concerned that introducing Ewing's testimony that she had punished Henyard

57

would open the door to harmful cross-examination of Ewing, in which Ewing would explain that she had punished Henyard because he frequently misbehaved and stole from her.

As to Henyard's pattern of seeking out younger children as companions due to his lower I.Q. and emotional immaturity, this evidence already was presented by a number of mitigation witnesses at sentencing. Both Turner and Nyoka Wiley testified at sentencing to the fact that Henyard preferred the company of younger children and resisted advancement in school. Dr. Toomer testified that Henyard had a low-average I.Q. and the mental and emotional maturity of a thirteen-year-old. Although Henyard identified and presented additional witnesses to these facts in the state 3.850 hearing, "[a] petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative." Van Poyck v. Florida Dep't of Corr., 290 F.3d 1318, 1324 n. 7 (11th Cir. 2002).[15]

---

[15]In this appeal, Henyard does not challenge his death sentence on the basis of his alleged mental and emotional age of thirteen. In particular, Henyard raises no claims pursuant to Roper v. Simmons, 543 U.S. 551, 578, 125 S. Ct. 1183, 1200 (2005) (finding a sentence of death unconstitutional as applied to criminals who were chronologically younger than eighteen at the time of their crime). Henyard raised such a claim on April 26, 2005, when he moved in the district court for abeyance of § 2254 proceedings while he filed a Roper motion in the state trial court. Henyard's state court motion argued that "[t]he evolving standards of decency in society prohibit the cruel and unusual execution of an individual who was the functional equivalent of a 13 year old at the time of the offense." The district court denied Henyard's motion for abeyance, and the Florida state courts eventually rejected his Roper motion.

Because Henyard does not reassert his Roper claim in district court or in this appeal, that

58

As to evidence that Henyard was harassed and teased by neighborhood children, again, trial counsel did not fail in this regard because Turner testified during the penalty phase concerning the teasing suffered by Henyard. As such, further testimony with respect to these facts would have been cumulative. Moreover, even at the state 3.850 hearing, the evidence suggested at most that Henyard experienced sporadic and certainly not severe teasing.

As to Henyard's supposedly chronic use of alcohol, the Florida Supreme Court found no evidentiary basis for believing that Henyard was a chronic substance abuser. Henyard v. State, 883 So.2d at 762-63. The only evidence that Henyard used alcohol or drugs came from Dr. Bowers, who testified at the state 3.850 hearing. Dr. Bowers stated that according to Henyard, he began drinking beer and using marijuana between ages eight and ten, but his use of alcohol and marijuana decreased when he moved to Pahokee to live with his father. Given that this is the only evidence of drug or alcohol use by Henyard, the Florida Supreme Court's finding – that Henyard failed to establish in the first place the fact that he was a chronic substance abuser – was not unreasonable. Henyard also fails to

_____

claim is not before us. However, we note that (1) Dr. Toomer was the only source of any evidence suggesting Henyard had a mental and emotional age of thirteen; (2) the trial court gave Dr. Toomer's testimony little weight, finding much of it incredible; and (3) Dr. Toomer also testified that Henyard's I.Q., though low, was within the average range, and that Henyard was able to appreciate the criminality of his conduct.

59

establish that the presentation of evidence of his periodic use of drugs and alcohol would have affected sentencing in any way.

As to Henyard's attempted suicide in jail while awaiting trial, the nurse at the jail where Henyard was housed testified that in his view, Henyard actually faked his suicide attempt in order to curry favorable treatment in jail. Counsel's strategic decision to avoid presenting evidence of Henyard's potentially staged suicide attempt was reasonable and thus cannot be the basis for a claim of ineffective assistance of counsel. See Fugate, 261 F.3d at 1223-24.

As to evidence that Henyard was sexually abused as a child by Bruce Kyle, the Florida Supreme Court found that trial counsel had not performed deficiently by failing to present such evidence during the penalty phase. The Florida Supreme Court's determination was not unreasonable. Although the notes of Henyard's lead counsel indicated that Henyard at one time had mentioned being sexually abused, lead counsel did not remember Henyard actually ever discussing sexual abuse with him. It is clear that Henyard's defense team made a concerted effort to investigate any history of sexual abuse, and they had reason to believe no such history existed. Henyard's assistant defense counsel, Williams, specifically asked him about sexual abuse, and Henyard told him that he was never sexually abused. Further, the notes of the jailhouse doctor who evaluated Henyard prior to trial –

60

notes that Henyard's defense team obtained prior to trial – indicated that Henyard had explicitly denied any history of sexual abuse.

In addition to the jailhouse doctor, Henyard's defense team hired two psychological experts, Dr. Toomer and Dr. McMann, to evaluate Henyard prior to trial expressly to aid in his mitigation case. Neither Dr. Toomer nor Dr. McMann stated that Henyard had mentioned any history of sexual abuse nor testified in any way about any such alleged abuse. Even Dr. Bowers, Henyard's psychological expert at the 3.850 hearing, gave no indication that Henyard had mentioned a history of sexual abuse. Of the three witnesses Henyard presented at the 3.850 hearing on the topic of sexual abuse, the defense team interviewed Turner extensively prior to trial and did not recall her mentioning that Henyard had reported to her being sexually abused. The defense team made unsuccessful efforts to contact Angelette Wiley. Defense counsel did not contact Lenon prior to trial, but at the time of Henyard's trial and sentencing, Lenon was living in a women's home in St. Petersburg.

Given Henyard's multiple denials of any history of sexual abuse and trial counsel's extensive and diligent efforts to build a mitigation case, the Florida Supreme Court's determination that counsel did not perform deficiently in this regard was neither "contrary to," nor "an unreasonable application" of, United

61

States Supreme Court precedent. See Callahan v. Campbell, 427 F.3d 897, 934 (11th Cir. 2005), petition for cert. filed (Apr. 13, 2006) (No. 05-10404) (concluding that counsel did not perform deficiently by failing to investigate allegation of sexual abuse because counsel received no indication such abuse occurred); Holladay v. Haley, 209 F.3d 1243, 1252 (11th Cir. 2000) (holding that counsel's failure to investigate defendant's psychological problems was not deficient performance because there was no indication that such psychological problems existed); Funchess v. Wainwright, 772 F.2d 683, 689 (11th Cir.1985) (finding counsel acted reasonably in not investigating defendant's psychological deficiencies because pre-trial psychological exam did not indicate problems and defendant did not tell counsel of psychological problems).

In addition, as the Florida Supreme Court noted, the only evidence of sexual abuse came from brief, second-hand accounts, and Henyard presented no testimony from his various experts concerning how the alleged sexual abuse from ten years prior to the crimes affected him as to the crimes in issue. Henyard v. State, 883 So.2d at 761. We therefore agree with the Florida Supreme Court that even assuming arguendo that his trial counsel performed deficiently with respect to the evidence of sexual abuse, Henyard has failed to show any prejudice arising from that failure.

Finally, Henyard contends that trial counsel inadequately prepared Dr. Toomer, his mental health expert. This argument is also without merit. Henyard's trial counsel prepared Dr. Toomer by providing him with depositions, trial documents, and Henyard's recorded interrogation with police, and by consulting with Dr. Toomer on a number of occasions. Henyard's trial counsel also retained another psychological expert, who did not testify because she herself stated that it would not be wise to call her as a witness. Moreover, as stated by the Florida Supreme Court, Dr. Bowers, Henyard's expert during the 3.850 proceedings, explicitly indicated that he found no error or impropriety in Dr. Toomer's preparation. Henyard v. State, 883 So.2d at 764.

In sum, none of the evidence presented in Henyard's 3.850 hearing suggested the presence of any additional statutory mitigating factors or the absence of any of the aggravating factors found at trial. None of Henyard's evidence leads us to doubt that his trial counsel diligently and strenuously worked to develop as complete a mitigation case as possible. Nor does any of the new testimony counter the overwhelming evidence of the brutal, gruesome, and aggravated nature of Henyard's crimes, in which Henyard carjacked and kidnaped a mother and her two young children, raped the mother in her children's presence, shot her four times, and then executed her children from close range.

63

## VII. CONCLUSION

For the foregoing reasons, the Florida Supreme Court's denial of habeas relief was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. See 28 U.S.C. § 2254(d)(1). Accordingly, we affirm the district court's denial of Henyard's § 2254 petition.

**AFFIRMED.**

BARKETT, Circuit Judge, concurring.

I agree that the district court's denial of Henyard's petition for habeas corpus must be affirmed because Henyard has not established that the state courts' rejection of the claims he makes here was contrary to, or an unreasonable application of, clearly established federal law pursuant to the requirements of AEDPA.  See 28 U.S.C. § 2254(d)(2); Williams v. Taylor, 529 U.S. 362, 405 (2000) (applying the standard set forth in § 2254(d)(2)).

I write to address the separate and troubling issue of Henyard's mental age. There is no dispute that Henyard committed a horrifying and heinous crime.  There is also no dispute that, notwithstanding Henyard's eighteen years of chronological age, he functions at the emotional level, or has the "mental age,"[1] of a thirteen year old.[2]  The Supreme Court has stated that "[c]apital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes' and

---

[1]"'Mental age' is commonly understood is the chronological age equivalent of the person's highest level of mental capacity. That is, judging only from the person's cognitive and behavioral capacities, what age would we typically associate with this level of functioning?  It is an incapacity to think or act on a higher level of functioning, not merely a failure to do so." James Fife, *Mental Capacity, Minority, and Mental Age in Capital Sentencing: A Unified Theory of Culpability*, 28 Hamline L. Rev. 237, 261 (2005) (footnote omitted) (citing Atkins v. Virginia, 536 U.S. 304, 310 (2002)).

[2]According to the Florida Supreme Court, the trial court found that, among other mitigating factors, Henyard was "acting under an extreme emotional disturbance and his capacity to conform his conduct to the requirements of law was impaired," Henyard v. State, 689 So. 2d 239, 244 (Fla. 1996), and that "the defendant functions at the emotional level of a thirteen year old and is of low intelligence," id.

65

whose extreme culpability makes them 'the most deserving of execution.'" <u>Roper v. Simmons</u>, 543 U.S. 551, 568 (2005) (quoting <u>Atkins</u>, 536 U.S. at 319).

The twofold test for whether capital punishment violates the Eighth Amendment assesses its furtherance of the two major goals of punishment—retribution and deterrence.  <u>Gregg v. Georgia</u>, 428 U.S. 153, 183 (1976) (plurality). The test for retribution measures the culpability of the defendant or the class of offenders to which the defendant belongs.  <u>Tison v. Arizona</u>, 481 U.S. 137, 149 (1987) ("The heart of the retribution rationale is that <u>a criminal sentence must be directly related to the personal culpability of the criminal offender</u>." (emphasis added)); <u>see also</u> <u>Penry v. Lynaugh</u>, 492 U.S. 302, 337 (1989) (O'Connor, J.) ("[V]irtually all of the States with death penalty statutes that list statutory mitigating factors include as a mitigating circumstance evidence that '[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.'" (footnote omitted; second alteration in original)).

The Court considered a defendant's culpability to be critical in <u>Atkins</u>:

Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial.  Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of

66

others.  There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders.  Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

536 U.S. at 318.

Likewise, diminished culpability is what motivated the Court's holding invalidating the juvenile death penalty in Simmons, wherein the Court stated that "[t]he same conclusions follow from the lesser culpability of the juvenile offender. . . . Retribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity." Simmons, 543 U.S. at 571.  "Once the diminished culpability of juveniles is recognized, it is evident that the penological justifications for the death penalty apply to them with lesser force than to adults." Id.[3]  Accordingly, the Court held that the Eighth Amendment prohibits the imposition of capital punishment on offenders under the age of eighteen at the time of offense.

---

[3]"What mental capacity and minority share as avoidances is their deviation from the adult norm of knowledge and behavior. The rationale for identifying this basis for mitigation appears to be fairness: it is unfair to hold someone to a standard of conduct which she cannot attain given her current condition. Because one lacking the ability to reach this level of conduct does not breach the standard voluntarily, and so would not be deterred from breach by punishment, there is no legitimate basis for punishment under conventional punishment theory." Fife, supra, at 260-61.

The characteristics identified by the Court as those which diminish culpability and thus militate against the imposition of the death penalty for children under the chronological age of 18 as well as the mentally retarded appear equally present in those with a mental age of less than eighteen years. The mere fact of a borderline, or even high IQ in an adult defendant with a mental age of a child does not necessarily render that defendant any more culpable than a chronological child with a high IQ. It is not an inability to understand that one is breaking the law that factors against death sentences for children and the mentally retarded—even a small child realizes when she is breaking the rules. It is the child's inability to understand why the rules exist, to appreciate the consequences of breaking them for herself and for society, and to consistently make judgments based on the foregoing which factor against sentencing children to death. As with children and the mentally retarded, mental age is not the result of a failure to abide by an expected standard, but an incapacity to evaluate and comprehend it.[4] The mere fact

---

[4] Furthermore, the tests for determining mental retardation and mental age seem to measure the same skills that would contribute to one's culpability. The American Psychiatric Association criteria for mental retardation are:
> A. Significantly subaverage intellectual functioning: an IQ approximately 70 or below on an individually administered IQ test.
> B. Concurrent deficits or impairments in present adaptive functioning in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.
> C. The onset is before age 18 years.

See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 41

of a defendant's chronological age should not qualify a defendant for death where

the measures of capacity render him lacking in culpability.  Although it may not be

directly before us, at some juncture this issue must be addressed.

---

(4th ed. text revision 2000).

Similarly, mental age can be measured with increasing accuracy based on some of the same measures:

> As the Supreme Court indicated in its discussion of mental retardation in Atkins, currently clinicians rely not only on intelligence scores derived from standardized tests, but also on the level of adaptive skills in communication, self-care and living skills, social skills, etc. Standard intelligence tests can be supplemented by other tests which correlate with IQ measures, but are less verbal-oriented, such as the Weschlser Memory Scale--Revised (WMS-R) or the Ravens Matrices Test. Clinical interviewing and background history can be used to help 'triangulate' an accurate mental age along with pure cognitive assessments. Thus, the imprecision due to failure to measure other indicia of maturity such as experience, judgment, and empathy, can be readily addressed by current diagnostic methods.

Fife, supra, at 271 (citations and footnotes omitted).